393 So.2d 438 (1980)
In the Matter of the SUCCESSION OF Ted F. DUNHAM, Sr.
No. 13177.
Court of Appeal of Louisiana, First Circuit.
December 19, 1980.
*440 Rosemary H. Williams and Thomas H. Benton, Baton Rouge, counsel for Richard E. Dunham, appellant.
J. Huntington Odom, Ashton L. Stewart, Baton Rouge, counsel for Katharine Oldham Dunham & Billy Joe Alexander and Anderson-Dunham, Inc., appellants.
Victor A. Sachse, III, & Claude Reynaud, Jr., Baton Rouge, counsel for Ted F. Dunham, Jr., appellant.
James D. Thomas, II, Baton Rouge, counsel for Donna Hamilton Dunham, appellee.
Robert A. Hawthorne, Jr., Davis A. Gueymard, Warren L. Mengis, for provisional trustees-appellants.
Before EDWARDS, LEAR and WATKINS, JJ.
WATKINS, Judge.
Ted F. Dunham died April 17, 1974. Numerous pleadings, some contradictory, have been filed since his death, and several contradictory hearings have been held. The present appeal is taken by Mrs. Katharine O. Hall Dunham (Mr. Dunham's widow by second marriage) on the one hand, and Ted F. Dunham, Jr. and Richard Elliott Dunham, and provisional trustees of trusts of which six grandchildren are beneficiaries, on the other hand, from judgment following a trial in which the issues to be considered in the present opinion were presented.
Ted F. Dunham was engaged in the lumber business in Oklahoma, and moved to Louisiana in 1937. He, Katharine O. Hall (the present Mrs. Dunham), and James L. Anderson formed Anderson-Dunham Concrete Co., Inc., the present Anderson-Dunham, Inc. in 1937, which had its principal place in and was incorporated under the laws of Louisiana. Anderson was domiciled in Oklahoma. Anderson-Dunham, Inc. (hereinafter Anderson-Dunham) was extremely successful financially, but it has not declared a dividend since 1943, the profits having been plowed back into the corporation.
Ted F. Dunham married twice. He divorced his first wife, Mayola Dunham, shortly after Anderson-Dunham was formed, and was married to Katharine O. Hall on April 24, 1940. No children were born of that second marriage; two children were born of the first marriage, Ted F. Dunham, Jr. and Richard E. Dunham, who are parties to the present litigation.
In his will, Ted F. Dunham created eight trusts, placing ¼ of his succession (net estate) *441 in each of two separate trusts for Ted F. Dunham, Jr. and Richard E. Dunham, respectively, and 1/12 of the residue of his succession in each of six separate trusts for six of his eight grandchildren. Katharine O. Dunham was named executrix, and the said Mrs. Dunham, Bill Alexander (who became president of Anderson-Dunham several months before Ted F. Dunham's death), and the Fidelity National Bank of Baton Rouge were named as trustees of each of the eight trusts. The Fidelity Bank declined the trust, and the Louisiana National Bank, Baton Rouge, Louisiana, was appointed co-trustee in its place and stead. In the course of the present litigation, two lawyers were appointed provisional trustees of the trusts for the six grandchildren.
Many issues of law, and some issues of fact, are presented on the present appeal, which we will, with one minor modification, discuss under the broad headings used by the trial court, which are as follows:
Ownership of 490 shares of Anderson-Dunham stock
Ownership of 1,000 shares of Anderson-Dunham stock
Ownership of Dunham Land, Inc.
Stock redemption
Validity of trusts re: impingement upon legitime
Removal of Mrs. Dunham as executrix, and Mrs. Dunham and Mr. Alexander as trustees, and
Value of succession property

OWNERSHIP OF 490 SHARES OF ANDERSON-DUNHAM STOCK
Mrs. Katharine O. Dunham claims 490 shares of stock in Anderson-Dunham, represented by Stock certificate No. 3, as her separate property. Ted, Jr. and Richard contend the stock is their father's separate property. The trial court found that the stock was Mrs. Dunham's separate property. After examining in detail the law and the evidence, including documentary evidence, we have concluded that the 490 shares were Ted F. Dunham's separate property.
On December 9, 1937, Anderson-Dunham was chartered. On December 10, 1937, shares of stock were issued as follows:
Certificate No. 1 - 500 sharesissued to James L. Anderson
Certificate No. 2 - 10 sharesissued to T. F. Dunham
Certificate No. 3 - 490 sharesissued to K. O. Hall
On the same day, Dunham endorsed Certificate No. 2 over to K. O. Hall, and K. O. Hall endorsed Certificate No. 3 over to Ted F. Dunham.
On April 24, 1940, Ted F. Dunham and Katharine O. Hall were married.
The endorsement of Stock Certificate No. 3 is in brown ink and is very faint. Some evidence of an attempt to eradicate the endorsement is found, there being light smears around the endorsement. In addition, the wording of the endorsement, while still legible, is very faint, as we have indicated, either as a result of age or as a result of an attempted eradication. Mrs. Dunham testified that she "eradicated" ("attempted to eradicate" would more accurately describe the apparent result) the endorsement, with Ted. F. Dunham's knowledge and consent.
Mrs. Dunham's testimony is that her husband and she had agreed that she would endorse over the 490 shares for purposes of financing the corporation only, with the understanding that she was true owner of the stock. Her testimony indicates that the attempted eradication was in furtherance of their original intent that she should own the 490 shares, and took place with Mr. Dunham's knowledge and consent because the stock book could not be found when Mr. Dunham returned from the service.
We find Mrs. Dunham's testimony as to Mr. Dunham's intentions to be rank hearsay and purely self-serving. The testimony, therefore, is of no probative value. If Mrs. Dunham has a claim to the stock, it must be found in other evidence.
The minutes of a shareholders' meeting held on January 12, 1943, list Stock Certificate No. 3 representing 490 shares as *442 "standing in the name of Katharine O. Hall Dunham", and 10 shares represented by Certificate No. 7 as also standing in her name. As "standing in the name of" refers to the name in which the stock was issued, and does not reflect endorsements, this documentary evidence is of no moment, as Mrs. Dunham was issued 490 shares. Nor does any significance attach to the fact that Mrs. Dunham signed a proxy for that meeting listing her as owning 500 shares, the proxy statement being related to the stock book, which did not reflect endorsements.
Somewhat more interesting, but likewise of no probative value, are the minutes of a stockholders meeting held on December 10, 1954, which list stock "standing in the name of the following stockholders":

Ted F. Dunham 1990 shares
Katharine O. Dunham 500 shares
Ernest D. Wilson 10 shares

These minutes are entirely incorrect in their tabulation of shares. They cannot reflect the entries in the stock book, as according to the stock book, Anderson still owned some shares. Nor can they reflect endorsements as Mrs. Dunham contends they stood after the attempted eradication of her endorsement, as she, if we accept her contention as to the attempted eradication, then owned 510 shares, not 500 shares:

Stock Certificate No. 3 490 shares
Stock Certificate No. 2 10 shares
Stock Certificate No. 7 10 shares
 ___
 510 shares

As the minutes of December 10, 1954, reflect neither the stock book nor stock certificates as endorsed, it is apparent that they were prepared carelessly and perhaps in haste, and are entitled to no probative value.
As Mrs. Dunham's testimony and the minutes and proxy are not entitled to weight, this leaves only the endorsement of Stock Certificate No. 3 to look to. The endorsement clearly places the stock represented by Certificate No. 3 (490 shares) in the name of Ted F. Dunham. Under the Uniform Stock Transfer Act, LSA-R.S. 12:601, stock stands in the name of the person to whom it is endorsed. The statute does not indicate that an eradication of an endorsement has any legal effect. In the present case, as we have seen, there was at most only an attempted eradication, as the endorsement over to Ted F. Dunham can still be clearly read. It is true that as between the parties, evidence other than the documentary evidence of the certificate itself as provided for in LSA-R.S. 12:601 may be considered. Richard v. Foods & Services, Inc., 162 So.2d 213 (La.App. 1st Cir. 1964), writ refused 246 La. 347, 164 So.2d 351 (1964); Feldheim v. Plaquemines Oil and Development Co., 282 So.2d 469 (La.1973); Dardeau v. Fontenot, 326 So.2d 521 (La.App. 3rd Cir. 1976). However, in the present case, as we have seen, no evidence of any probative value has been introduced to show that the endorsement of Stock Certificate No. 3 to Ted F. Dunham does not reflect the true legal ownership of the stock represented thereby. We also note in passing that if the endorsement had been purely for purposes of securing financing, as Mrs. Dunham claims, the endorsement would, more likely than not, have been made in blank. It was made to Ted F. Dunham instead.
We, therefore, hold that the 490 shares represented by Stock Certificate No. 3 of Anderson-Dunham were Ted F. Dunham's separate property.

1,000 SHARES OF ANDERSON-DUNHAM
The incorporators of Anderson-Dunham, Inc. were James L. Anderson, Ted F. Dunham, and Katharine O. Hall. On December 9, 1937, the corporation was chartered in Louisiana. By instrument dated August 5, 1939, executed in Oklahoma, James L. Anderson and Ted F. Dunham entered into what the instrument characterized as a "conditional sale" of 1,000 shares of Anderson-Dunham from Anderson to Dunham. Payment of the purchase price was to be made over a period of time, and title was to remain in the vendor until final payment was made. At the time, Anderson was domiciled in Oklahoma and Dunham in Louisiana. On April 24, 1940, Ted F. Dunham *443 and Katharine O. Hall were married. The final payment of the purchase price was not made until 1943. The 1,000 shares were still held by Ted F. Dunham at the time of his death, and were inventoried as community property of Dunham's marriage to Katharine O. Hall. Decedent's sons contend the 1,000 shares are Ted. F. Dunham's separate property. At all times Anderson-Dunham was domiciled in, and had its principal place of business in, Louisiana.
The trial court held the 1,000 shares of Anderson-Dunham were Ted F. Dunham's separate property. We affirm.
Unless we were to quote the August 5, 1939, instrument in full, we could not improve upon the trial court's description of the instrument. We, therefore, quote from the description of the instrument as found in the written reasons for judgment, at some length:
"After a brief indication as to the purpose of the agreement, it is stated that `... it is necessary that such proposed sale and purchase be a conditional sale and, in order to protect the rights of the party of the first part (Anderson), and guarantee performance of the terms of the offer to buy the stock of the party of the first part, the parties have agreed upon a plan of operation for conducting the business of Anderson-Dunham Concrete Co., Inc., so long as any part or portion of the agreed sales price for such shares of (sic) shall remain unpaid.' In the Court's opinion, the word `guarantee' indicates that a deal has been consummated relative to the object and price, and, since the price had not been paid, Anderson desired to insure payment.
"Consistent with this theme, that is, that the sale was complete but Anderson wanted to guarantee the purchase price, are several other provisions of the agreement. In paragraph # 2 of the agreement, it is further provided that Anderson `... shall retain possession and title to said shares ... until the amounts provided by this contract to be paid have been fully paid in cash.' After payment, Anderson was required by this provision to do all that was necessary to accomplish the transfer of the stock to Dunham. Another provision evidencing the desire of Anderson to guarantee payment of the purchase price is set forth in paragraph # 3 of the agreement wherein it is provided that in the event of the failure of Dunham to make any payment on time or of the breach of the contract in some other fashion, Anderson was granted the election to demand that `... the entire unpaid purchase price of such shares of stock ... shall ... become and be immediately due and payable....'
"A strong indication of further effort to secure performance of the purchase price is contained in paragraph 6 wherein it is provided that until all payments have been made, Dunham shall have no right to transfer or encumber any of Dunham's interest in Anderson-Dunham. However, the principal provision in the agreement compelling performance of payment is contained in paragraph # 7 which provides that in the event of breach of any terms or conditions of the agreement, Anderson, at his opiton, (sic) may `... proceed to sell all or any part of the above described shares of stock at public or private sale....' It is further stated that the stock is provided as security for the performance of the agreement. Coupled with these terms are the last two sentences in paragraph # 7, which in the opinion of the Court are the most significant terms of the agreement which were to provide leverage to insure payment. These state: `In the event of the sale of the collateral hereby pledged, the proceeds from such sale shall be first applied to the expenses of sale, including attorney fees, as herein provided for; next to the payment in full of all obligations of the party of the second part (Dunham) in favor of the party of the first part (Anderson) created hereby; and the balance remaining, if any, shall be paid to the party of the second part (Dunham). The party of the first part (Anderson) may become the purchaser of such collateral hereby pledged at any sale so had.' Obviously, it would be inappropriate for Dunham to receive anything from the proceeds of the sale of the collateral if he did *444 not own the stock. Further, it would be illogical for Anderson to buy something back he already owned.
"As a final measure to guarantee payment of the balance of the indebtedness, paragraph # 12, provides that all of the dividends declared by Anderson-Dunham will be credited to the last payments due on the stock. Although it may be argued that the portion of the sentence which states `... all dividends received by the party of the first part (Anderson), by reason of ownership of the stock hereinabove described ....' may indicate that the ownership of the stock still remained in Anderson, a practical application of the provision indicates otherwise. Under that provision Dunham, not Anderson, is the actual recipient of the benefit from the dividends in that the dividend is credited to the amount owed by Dunham for the stock."
We, thus, see that (1) both Anderson and Dunham had rights which came into existence in 1939 immediately upon the instrument's execution by virtue of the instrument, and (2) both Anderson and Dunham were bound by the terms of the instrument. Thus, although title, by the terms of the instrument itself, did not pass until final payment was made (1943), Dunham had indefeasible rights in 1939, before his second marriage took place.
A case involving a somewhat similar question, Barbet v. Langlois, 5 La.Ann. 212, was decided by Justice Slidell in 1850. By act of Congress in 1811, the owner of lands fronting on a water course was given a right to a "double concession", that is, a right to purchase lands to the rear to a depth of 40 arpents. Andre Langlois, plaintiff's husband in that case, had a right to a double concession before marriage to plaintiff, but he did not purchase the land until after the marriage. The court held that the "cause" of the acquisition (using the Court's own quotes) arose before marriage, and the land was his separate property.
It is true that the force of Barbet was somewhat eroded so far as immovables are concerned by subsequent decisions, most notably Ober v. Williams, 213 La. 568, 35 So.2d 219 (1948). However, a view similar to that taken by Barbet was taken with respect to movables in Due v. Due, 342 So.2d 161 (La.1977), which held that a contingent fee contracted for in favor of a lawyer during marriage is community property, although the case from which the fee arose was not concluded until after the marriage was dissolved. Barbet represents, and must represent, the law of this state so far as movables are concerned. Because Dunham had indefeasible rights in the 1,000 shares of Anderson-Dunham when the instrument was executed in 1939, and the "cause" of Dunham's subsequent acquisition of title arose then, the 1,000 shares were Dunham's separate property.
We further see that if we look to the time the sale itself took place, it took place in 1939, before the marriage.
Oklahoma law should not be applied in determining when the sale took place, but, rather, Louisiana law. The parties to the present litigation are domiciled in Louisiana. The corporation is domiciled in Louisiana. No one domiciled in Oklahoma will be affected by the outcome of the present litigation.
Louisiana has in recent years adopted the interest analysis approach in choice of laws with respect to contracts. In other words, the law of the place that has the greatest interest in the contract and its effect will be applied. Sutton v. Langley, 330 So.2d 321 (La.App. 2d Cir. 1976), writs denied 332 So.2d 805, 332 So.2d 820, 333 So.2d 242 (1976), adopted the interest analysis approach after a full discussion of the problem, and specifically rejected the approach which would apply the law of the place where the contract was executed (the lex loci contractus approach). Also among several cases taking the interest analysis approach are Douglass v. Equitable Life Assurance Society, 150 La. 519, 90 So. 834 (1922), and Wickham v. Prudential Ins. Co., 366 So.2d 951 (La.App. 1st Cir. 1979).
Civil Code art. 10 adopts the lex loci contractus approach in its first paragraph. *445 However, this paragraph of the Codal article dates from the time that the lex loci contractus view was generally taken in this nation, and must be regarded as having been rejected by the line of jurisprudence alluded to above. It is quite true that art. 10 was reenacted in 1979 by Act No. 711, Sec. 1, which took effect January 1, 1980. However, it is apparent that the 1979 act was passed to bring this article into conformity with the new matrimonial regimes statute, and that the legislative purpose was not to revert to the lex loci contractus approach. If the legislative purpose had been to revert to that approach, it could have been stated in the Comments set forth under art. 10. No such legislative purpose is stated or hinted at.
We must, therefore, apply Louisiana law in determining when the sale was completed.
First, we should consider two Civil Code articles which are directly in point, arts. 2456 and 2462.
Article 2456 states:
"The sale is considered to be perfect between the parties, and the property is of right acquired to the purchaser with regard to the seller, as soon as there exists an agreement for the object and for the price thereof, although the object has not yet been delivered, nor the price paid."
Article 2462 states:
"A promise to sell, when there exists a reciprocal consent of both parties as to the thing, the price and terms, and which, if it relates to immovables, is in writing, so far amounts to a sale, as to give either party the right to enforce specific performance of same.
"One may purchase the right, or option to accept or reject, within a stipulated time, an offer or promise to sell, after the purchase of such option, for any consideration therein stipulated, such offer, or promise can not be withdrawn before the time agreed upon; and should it be accepted within the time stipulated, the contract or agreement to sell, evidenced by such promise and acceptance, may be specifically enforced by either party."
We see that a sale exists as between the parties when there is agreement as to the object and the price, and that even if there is only a promise to sell, it may be specifically enforced by either party (thus, if the latter view is taken of the present case, again bringing into control the position of Barbet, supra).
However, if we consider the holding in State ex rel. Bulkley v. Whited & Wheless, 104 La. 125, 28 So. 922 (1900), we see beyond question that there was a completed sale.
In Bulkley, an instrument provided for the credit sale of corporate stock and placed the stock in the hands of an escrow agent. Title was not to be delivered until final payment was made. The Court held that there was a completed sale when the instrument was executed as there was agreement as to the thing and the price. The present factual situation is somewhat weaker, as in the present case there was no delivery, even to an escrow agent; Anderson retained possession of the stock certificate. However, Bulkley, is founded upon the analysis that there was agreement as to the thing and the price. Little or no emphasis was placed upon the question of delivery. Indeed, a reading of art. 2456 of the Civil Code shows delivery is of no moment, as under that article, a sale as between the parties takes place when there is agreement as to the object and the price "although the object has not yet been delivered, nor the price paid."
Thus, in the present case, there was a completed sale in 1939. The property was Ted F. Dunham's separate property.

DUNHAM LAND, INC.
We find that the trial court was correct in its determination of ownership of the stock in Dunham Land, Inc. We, therefore, adopt its holding on that question as our own, and quote from its written reasons for judgment:
"The focal issue in this dispute is the ownership of a 30,000 acre ranch located *446 at Marfa in West Texas. Approximately 22,000 acres of this land is and has been listed as an asset of Dunham Land, Inc. since the purchase of the ranch in 1969. The corporation is carried on the corporate books of Anderson-Dunham, Inc. as a wholly owned subsidiary. (Exhibit A-10) Ted and Richard Dunham, however, claim ownership of the stock of Dunham Land, Inc. as follows:

Ted Dunham, Sr. 350 shares
Ted Dunham, Jr. 300 shares
Richard Dunham 350 shares

"Initially, Dunham Land, Inc. was set up at the instance of Ted Dunham, Sr. by an attorney in Texas. It is clear that the plan of the senior Dunham was to have Dunham Land, Inc. incorporated with shares to be issued to he (sic) and his sons in the proportions as set forth above. It also seems that as part of the plan, there would be a transfer of the stock to Anderson-Dunham. The stock certificates were issued to Ted, Sr., Ted, Jr. and Richard on April 11, 1969, and by them endorsed in blank on the back of each of the certificates. (Exhibit Joint 14, 15, 16) On May 1, 1969, a stock certificate was issued to Anderson-Dunham for 1000 shares of Dunham Land, Inc. which is the total authorized stock of the latter corporation. (Exhibit Bernhardt - 2) Richard Dunham signed this stock certificate as secretary of Dunham Land, Inc.
"All of the documentary evidence submitted on the trial of the issue reflects that Dunham Land, Inc. was funded by Anderson-Dunham, Anderson-Dunham paid for the incorporation expenses and acquisition of the ranch property by Dunham Land, Inc. (Exhibits Bernhardt # 3, # 4, # 5, # 6, and # 7) Further Dunham Land, Inc., which has not been a financially successful venture, has required substantial annual contribution from Anderson-Dunham to make up its deficits. All of the tax returns of Anderson-Dunham have carried Dunham Land, Inc. as one of its corporations. On the other hand, both Ted Dunham and Richard Dunham acknowledged that until this litigation commenced, neither carried Dunham Land, Inc. as an asset on their financial statements. (Transcript 195, 253) The Court also finds it significant that the minutes of a special meeting of the Board of Directors of Anderson-Dunham held on May 7, 1974, in which Ted Dunham and Richard Dunham participated, reflects (sic) that Dunham Land, Inc. is a wholly owned subsidiary of Anderson-Dunham. (Exhibit Ted Dunham, Jr. # 2)
"On the other hand, the younger Dunhams rely principally upon the testimony of James McPherson and Ossie Brown regarding statements which they heard Ted Dunham, Sr. make prior to his death regarding the ownership of the ranch in West Texas. Counsel for Mrs. Dunham and Bill Alexander vigorously objected to this testimony as being hearsay. The general rule is that declarations of a party deceased are inadmissible if the same would be excluded as hearsay were he alive. Micheli v. Toye Bros. Yellow Cab Co., 174 So.2d 168 (La.App. 4th Cir. 1965) Generally, such statements are admitted under an exception to the hearsay rule, declarations against interest. Wall v. Murrell, 280 So.2d 865 (La.App. 3rd Cir. 1973). While the Court may find that the statements attributable to Dunham on the two occasions described as constituted (sic) admissions against interest, there is no question but this is the weakest type of evidence and has little probative value. Phillips v. Nereaux, 357 So.2d 813 (La. App. 1st Cir. 1978).
"Essentially, the testimony of McPherson was that Ted Dunham, Sr. told him that he and his two sons owned the ranch in Marfa, Texas. (Transcript pg. 216) Brown testified that he was at Dunham's office with Ted Dunham, Jr. and after some discussion about the ranch, he saw Ted, Jr. give his father some money and make some statement to the effect that it was for `our share' for the ranch. (Transcript pgs. 227, 232) Ted Dunham, Jr. testified that he handed his father several hundred dollars for his share of the ranch and that Ossie Brown was present at the time. (Transcript pgs. 193, 194)
*447 "The testimony admitted over the objection pales in comparison to the substantial documentary evidence that Dunham Land is a wholly owned subsidiary of Anderson-Dunham. The Court finds that this documentary evidence, coupled with the evidence of tacit acknowledgment thereof by the young Dunhams, is substantial and convincing."

REDEMPTION OF 394 SHARES OF ANDERSON-DUNHAM STOCK
Before Ted F. Dunham, Sr., died, a meeting of the board of directors of Anderson-Dunham adopted the following resolution on February 12, 1973:
"BE IT RESOLVED that on the death of any stockholder of the Corporation, the Corporation shall redeem or purchase as treasury stock so much of the deceased stockholder's stock as his administrator or beneficiary may desire to sell. In no case shall the price of the stock be less than its book value as determined in the Corporation's previous certified audit or greater than 105% of such book value."
On May 10, 1977, Mrs. Dunham as testamentary executrix filed a petition for authority to sell 394 shares of stock in Anderson-Dunham under the redemption agreement, the stated purpose being to pay succession debts and expenses and to secure a tax advantage under 26 U.S.C. § 303. Richard E. Dunham thereupon filed a petition for a preliminary injunction to block the sale. After trial on the rule for a preliminary injunction to prevent the sale, the preliminary injunction was denied and judgment was signed, dated August 8, 1977, authorizing the sale of 394 shares of Anderson-Dunham for $1,519.15 per share or a total price of $590,545.10.
Richard E. Dunham did not attempt to take a suspensive appeal. A devolutive appeal was granted Richard E. Dunham on August 30, 1977. This Court in Succession of Dunham, 359 So.2d 674 (La.App. 1st Cir. 1978), in a decision rendered May 1, 1978, held that the issuance of the injunction was moot, as the sale had taken place. We reserved appellant's rights to proceed to annul the sale or to recover damages in the following paragraph:
"The appeal is dismissed as moot with full reservation of Appellant's rights to proceed against the Appellee and/or Anderson-Dunham Inc., to annul the sale of stock or against Appellee for alleged breach of Appellee's fiduciary duty as trustee of (sic) testamentary executrix of decedent's succession." (359 So.2d 674, 676)
Richard and Ted, Jr., then brought the present action to have the sale set aside. The trial court refused to set the sale aside. We affirm, but reserve Richard E. Dunham's and Ted F. Dunham, Jr.'s right to recover damages.
On the trial of the present action, Mr. Leonard Blanchard, a certified public accountant and a senior partner in Basil Lee and Associates, testified that some $500,000.00 in corporate net income that would have been credited to the book value on the very day after the sale was perfected was not included in determining book value for purposes of the sale. The succession thereby lost the effect that some $500,000.00 in Anderson-Dunham profits would have had in the determination of the book value of the 394 shares to be sold to pay succession debts. The pleadings show that the sale ordered by the court was set at a price to reflect 105% of book value. Although the sale was not for a smaller amount than the specific amount authorized by the judgment, it was, taking into consideration the $500,000.00 in corporate profits, made for less than 105% of the sum that in effect constituted book value on the day of the sale. It was clearly Mrs. Dunham's duty as executrix to have obtained an amended court order setting a sale at a higher price or at a price in the amount that constituted 105% of book value on the day of the sale. In failing to do so, Mrs. Dunham violated her fiduciary duty to preserve the succession property, as set forth in articles 3191 and 3221 of the Code of Civil Procedure, which read as follows:
"Art. 3191. General duties; appointment of agent
*448 "A succession representative is a fiduciary with respect to the succession, and shall have the duty of collecting, preserving, and managing the property of the succession in accordance with law. He shall act at all times as a prudent administrator, and shall be personally responsible for all damages resulting from his failure so to act.
"A nonresident succession representative may execute a power of attorney appointing a resident of the state to represent him in all acts of his administration. A resident succession representative who will be absent from the state temporarily similarly may appoint an agent to act for him during his absence. In either case, the power of attorney appointing the agent shall be filed in the record of the succession proceeding."
"Art. 3221. Preservation of succession property
"A succession representative shall preserve, repair, maintain, and protect the property of the succession."
It is clear that Mrs. Dunham violated her fiduciary duty in selling the stock at the price ordered by the Court without obtaining an amended order to sell at an increased price because she thereby failed to preserve the succession assets. We cannot find, however, as the appellants contend we should, that Mrs. Dunham violated her fiduciary duty as executrix for the additional reason that she attempted to benefit herself by the sale by seeking to increase her equity in and control of Anderson-Dunham. A sale by a succession representative to himself, although an intermediary is involved, is subject to being set aside in other states, regardless of personal benefit to the succession representative or converse harm to the succession (estate), as a violation of the duty of loyalty. See, for example, Davis v. Jenkins, 236 N.C. 283, 72 S.E.2d 673 (1952). In Louisiana law, a succession representative cannot contract with himself, even through an intermediary, and such a sale is voidable. C.C.P. art. 3194. However, art. 3195 spells out five exceptions to this rule, three of which are here pertinent:
"(1) The surviving spouse of the deceased;
"(2) A partner of the deceased, with respect to the assets and business of the partnership;
"(3) A co-owner with the deceased, with respect to the property owned in common;"
It is apparent that the first exception, where a succession representative is a surviving spouse in community of the deceased, is especially pertinent. Mrs. Dunham is Ted Dunham's surviving spouse in community. Also, by regarding the policy behind exceptions (2) and (3), we see that they also apply, as Mrs. Dunham is a corporate stockholder in a closely held corporation with the deceased and is thus in a position analogous to a partner of the deceased or a co-owner with the deceased.
It might be argued that the present sale is taken out of the policy spelled out by the exceptions to LSA-C.C.P. art. 3194 set forth in art. 3195 because in this case the sale benefited the executrix. However, in all likelihood all sales that would be made to the persons excepted by art. 3195 would benefit the persons excepted, or they would never take place. The policy behind this codal article clearly contemplates benefit to the persons excepted.
A further possible ground for setting the sale aside is that Leonard Blanchard, a CPA, testified that Mrs. Dunham should have permitted a spin-off of the land held by Dunham Land, Inc., or in other words, a distribution in kind to the shareholders of Anderson-Dunham, which was, as we have held, sole shareholder in Dunham Land. A favorable tax result probably would thereby have been obtained, and this action probably would have been preferable to selling the land owned by Dunham Land to pay off the notes given to finance the redemption, such a sale having been contemplated. However, there is no certainty that such a course of action would have been possible (and it would not have been possible until a final determination was made by the courts as to the ownership of the shares in Dunham Land), and there is no clear proof that *449 Mrs. Dunham acted in bad faith in not attempting the spin-off. We find no evidence that any tax adviser advised Mrs. Dunham to make the spin-off, at least, not until she received Mr. Blanchard's implied advice, which was given only after the redemption had taken place.
Furthermore, Dunham Land, Inc. was only remotely connected with the succession. It was a wholly owned subsidiary of Anderson-Dunham, Inc. Mrs. Dunham, as executrix and shareholder, controlled Anderson-Dunham. To make the spin-off, it would have been necessary for Mrs. Dunham to have voted Anderson-Dunham stock to order the directors of Dunham Land to vote the stock in Dunham Land to make a distribution in kind. We are unwilling to pierce two "corporate veils".
It appears from a quotation of the earlier Succ. of Dunham, supra, that this Court refused to set aside the sale in that case for two reasons: (1) Anderson-Dunham was not a party to the proceedings, and (2) relief in the form of annulment was not sought. The following quotation applies:
"Appellant maintains that the appeal should not be dismissed because issues other than the right to injunctive relief are involved. It is contended that the sale could be nullified, or that at least it should be decided whether Appellee has breached her fiduciary duty as succession executrix or trustee, as alleged.
"These issues, however, are not properly before us since Appellant has sought relief only in the form of injunction to prevent the proposed sale. Appellant has not sought removal of Appellee as either executrix or trustee.
"Relying upon Bordelon v. Bordelon, 180 So.2d 855 (La.App. 3rd Cir. 1965) and La.C.C.P. Article 2164, Appellant suggests that we may consider the alleged breaches of fiduciary responsibility because we are permitted to render any judgment which is just, legal and proper on the record on appeal. We note, however, that Bordelon, above, was an action specifically to annul a sale and not an action for an injunction.
"The corporation which purchased the stock is not a party to these proceedings. No judgment, therefore, may be rendered herein affecting the rights of said purchaser. We find no merit in Appellant's suggestion that said corporation is in effect before the court. So far as the record shows in this instance, Appellee is not the alter ego of the corporation; neither has the corporate veil been pierced.
"The appeal is dismissed as moot with full reservation of Appellant's rights to proceed against the Appellee and/or Anderson-Dunham, Inc., to annul the sale of stock or against Appellee for alleged breach of Appellee's fiduciary duty as trustee of testamentary executrix of decedent's succession." (359 So.2d 674, 675, 676)
Although the appellant's rights were reserved to set aside the sale (or to obtain damages), the reservation of rights by this Court cannot have created any new rights in favor of the beneficiaries of the Dunham trusts that did not exist under Louisiana law against the succession representative for breach of a fiduciary duty. Clearly a breach of Mrs. Dunham's fiduciary duty as executrix arose in Mrs. Dunham's permitting the redemption of the 394 shares of Anderson-Dunham to take place at the price contained in the judgment. However, the question arises as to whether or not Louisiana law provides redress in the form of setting aside the sale.
A sale made by a succession representative to himself that does not fall within the exceptions set forth in LSA-C.C.P. art. 3195 may be set aside under art. 3194. The present sale falls within the exceptions, as we have stated. We have also quoted LSA-C.C.P. arts. 3191 and 3221. The language of these two articles must be read together in determining what redress exists for the succession representative's failure to preserve the succession property. Article 3191, which is the only article that mentions a remedy or redress, provides that the succession representative shall be personally liable for all damages resulting from his failure to act as a prudent administrator. *450 From the first sentence of the article, it is apparent that breach of the "duty of collecting, preserving, and managing the property of the succession in accordance with law" is a breach of the duty to act as a "prudent administrator". As art. 3221 of the Code of Civil Procedure also says that a succession representative shall "preserve" and "protect the property of the succession", it is apparent that a failure to do so is a failure to perform the succession representative's duty to "collect, preserve and manage the succession property in accordance with law", and hence a failure to act as a "prudent administrator".
The only fair conclusion that we can come to is that there is but one remedy for the failure of the succession representative to preserve and protect the succession property (if he does not enter into a forbidden contract with himself) and that is for damages. Only one case is stated in the Code of Civil Procedure in which a contract may be set aside, and that is where the succession representative contracts with himself, even through an intermediary, and none of the stated exceptions is present. (C.C.P. arts. 3194, 3195.) Here, even if we consider the redemption to constitute a sale by the executrix to herself through an intermediary (Anderson-Dunham), a question upon which we do not need to render a decision, nevertheless, as we have seen, Mrs. Dunham falls within the stated exceptions and the sale cannot be set aside for that reason. Then we fall back upon arts. 3191 and 3221, which read together, provide but one remedy for mismanagement, damages. See also, Langendorf v. Administrators of Tulane Education Fund, 361 So.2d 905 (La.App. 4th Cir. 1978), writs refused 363 So.2d 1384, 364 So.2d 120 (1978). In the present case, damages are not sought. There is no showing as to quantum. All that is sought is a judgment setting aside the sale. The codal authority does not afford that remedy. Hence, we must refuse to set aside the sale. We reserve appellant's rights to proceed against Mrs. Dunham by separate action to obtain damages for her breach of fiduciary duty.

LEGITIME
Richard E. Dunham and Ted F. Dunham, Jr., contend that the trusts of their legitime should be struck down for two reasons:
(1) That the provisions of the Trust Code permitting the legitime to be placed in trust with spendthrift provisions (LSA-R.S. 9:1841 et seq., and see more specifically 9:1843) violated art. 12, Sec. 5 of the Louisiana Constitution of 1974, which provides in its first sentence, "No law shall abolish forced heirship."
(2) That the trusts as written constitute an impingement upon the legitime, as no income is being paid the two forced heirs, Richard and Ted, Jr.
In his will, Ted F. Dunham left ¼ of his succession in trust to each of his two forced heirs, Ted, Jr. and Richard, subject to spendthrift provisions, that is, provisions that restrict the voluntary or involuntary alienation of the beneficiaries' interest to the maximum extent permitted by Louisiana law. Ted, Jr. and Richard were principal and income beneficiaries of their respective trusts. The duration of each trust was the life of that beneficiary. These trusts have as their principal asset stock in Anderson-Dunham. Anderson-Dunham has paid no dividends since 1943, although it is prospering.
It was held in Succ. of Earhart, 220 La. 817, 57 So.2d 695 (1952) that permitting the legitime to be placed in trust did not violate the constitutional prohibition in the Constitution of 1921 stating "no law shall be passed abolishing forced heirship" (Art. 4, Sec. 16). The Court stated that "This provision does not prohibit the legislature from regulating or restricting the rights of forced heirs." Similarly, the provisions in the Trust Code that permit the legitime to be placed in trust do not "abolish forced heirship"; they merely regulate or restrict it, which the holding in Earhart specifically permits to be done.
It is true that the trust involved in Earhart was not a spendthrift trust. However, the legitime was placed in a spendthrift *451 trust in Succ. of Singlust, 169 So.2d 10 (1964), writ refused 247 La. 262, 170 So.2d 512 (1965). The Court of Appeal, Second Circuit, cited Earhart as authority, and held that the Trust Estate Law's permitting a trust of the legitime did not violate the Constitutional prohibition against abolishing forced heirship.
Since these cases were decided, a new Constitution has been adopted and ratified, and has taken effect. However, it is apparent that the rule of Earhart and Singlust was strengthened, and in no way altered, as the new Constitution uses practically the same language, with slight variation, with regard to forced heirship, the new Constitution stating: "No law shall abolish forced heirship" and further adding, "Trusts may be authorized by law, and a forced portion may be placed in trust." (Art. 12, Sec. 5)
We find the new Constitutional provision, which strengthens Earhart and Singlust, to be controlling, and hold that the provisions of the Louisiana Trust Code permitting the legitime to be subjected to a spendthrift trust (LSA-R.S. 9:1841 et seq.) do not abolish forced heirship, but regulate and restrict it, and hence are constitutional.
A more serious question is raised by the contention that there is an impingement upon the legitime because the legitime in trust is not productive of income. The principal trust property, the stock in Anderson-Dunham, has not paid a dividend since 1943. The trial court found, among other things, that it would be premature to determine that income in one form or another would not be paid in the future. The trial court further found the question to be premature because Mrs. Dunham and Mr. Alexander had been removed as trustees of the trusts for Ted F. Dunham, Jr. and Richard E. Dunham, and thus it was likely that dividends might be paid in the future. We have carefully considered the possibility of terminating the trusts, or ordering that the stock held in trust for Ted F. Dunham, Jr. and Richard E. Dunham be sold, and have concluded that it would be premature to take either action judicially, as we are herein (below) ordering the removal of Mrs. Dunham and Mr. Alexander as trustees of all eight trusts (including the trusts for the grandchildren).
We note that the trusts are for the lives of the two forced heirs; there is no possibility of their ever receiving principal. An increment to principal is of no benefit to them. To receive their legitime, they must receive income as well as the hollow and meaningless shell of principal, and income from Anderson-Dunham must necessarily be in the form of dividends.
It was held on appeal of a summary judgment against a forced heir in Succ. of Burgess, 359 So.2d 1006 (La.App. 4th Cir. 1978), writ denied 360 So.2d 1178 (1978), that swampland in trust would not satisfy legitime requirements where a forced heir was principal and income beneficiary of a trust created for his life (subject, in that case, to the usufruct of the surviving spouse) if the swampland was unproductive. The Court further stated that the swampland should be sold if income from the swampland was found to be insufficient to satisfy the legitime, the measure of sufficiency being the present value of future income the forced heir could expect based on his life expectancy.[1]
The principal is thus established by Burgess that if an income and principal interest representing the legitime is placed in trust, the trust property must be at least reasonably productive of income.
The prudent man rule with respect to trust investments, which is stated in the Trust Code under LSA-R.S. 9:2127, also requires that trust property must be productive to be retained. That section reads as follows:
"Unless the trust instrument provides otherwise, in acquiringinvesting, reinvesting, exchanging, retaining, selling, and managing trust property a trustee *452 shall exercise such skill and care as a man of ordinary prudence, discretion, and intelligence would exercise in the management of his own affairs, not in regard to speculation but in regard to the permanent disposition of his funds, considering the probable income as well as the probable safety of his capital. Within the limitations of the foregoing standard, a trustee is authorized to retain and acquire every kind of property and every kind of investment. Unless the trust instrument provides otherwise, the trustee may retain its own stock together with any rights pertaining thereto but it may not acquire its own stock except as an incident of ownership at the beginning of the trust."
As property not constituting the legitime must be sold if it does not yield sufficient income, still more must property that constitutes the legitime be sold or otherwise disposed of if in time it is unproductive of income, for two reasons: (1) retaining the property in trust impinges upon the legitime, and (2) retaining the property in trust violates the prudent man rule with respect to investments.
We have concluded that the trusts should not be terminated. Testaments are not written to be broken; absent illegal or immoral intent, they are to be upheld. The decision in Lelong v. Succ. of Lelong, 164 So.2d 671 (La.App. 3d Cir. 1964), which refused to terminate a trust prematurely where the trust was not under attack for impingement upon the legitime, is applicable to the present case, where the trust is under attack on the basis that it impinges upon the legitime, because it shows a policy that a trust should not be terminated lightly or without due consideration of other alternatives. The following quotation, while not directly applicable because it deals with the construction of an unclear trust instrument, reflects that policy.
"The following general legal principles are applicable herein:
'Whenever possible, that construction of a trust instrument will be favored which upholds the validity of the trust and renders the instrument effective.' 90 C.J.S. Trusts Sec. 161 d, p. 20. `In construing a trust, the settlor's intention controls and is to be ascertained and given effect, unless opposed to law or public policy.' Id. at Sec. 162 a, p. 26. `Parol or extrinsic evidence may be admitted to aid in construing a trust instrument only if the instrument is ambiguous or uncertain, and only to explain, and not to contradict, the instrument.' Id. at Sec. 165 a, p. 34.
We must also here note the principle stated as follows at 90 C.J.S. Trusts Sec. 163, p. 32: ` * * * it has also been held that instruments creating trusts are to be liberally construed to carry out the intention of the trustor, and that the court should construe conditions liberally, whenever it may properly do so, in order to avoid a forfeiture. So, if the creator's discernible purpose would be thwarted by a literal and strict interpretation, but would be consummated by a liberal construction, it has been held nothing but equity so to construe the instrument as to realize that purpose.'" (164 So.2d 671, 674, 675)
We have also given careful consideration to the possibility of ordering that the trustees of the trusts for Ted F. Dunham, Jr. and Richard E. Dunham sell the stock in Anderson-Dunham placed in those trusts. We note that the trustee may, indeed must, sell trust property if it is unproductive of income, and particularly is that the case, in view of Burgess, if the trust is of the children's legitime in which an interest in income is given in partial satisfaction of the legitime. However, as indicated, we are herein ordering the removal of Mrs. Dunham and Mr. Alexander as trustees of the trusts for the two children and six of the eight grandchildren. The Trust Code imposes a duty upon the trustees to take all steps within their power to make the trust property productive of income. It is possible that when the new trustees are sent into possession of the Anderson-Dunham stock as trustees their presence will cause the corporation to declare dividends. We do not find that it violates the spirit of *453 Burgess to decline to order an immediate sale of the Anderson-Dunham stock, or that the prudent man rule requires a sale without judicious hesitation to allow new trustees to exert their influences. The stock is in a closely held corporation. It is somewhat unlikely that if the Anderson-Dunham stock held in the trusts for the children is ordered sold, it will produce its true value. A minority interest in a closely held corporation does not generally sell for its true value. We believe that the better course is to determine not to order a sale of the Anderson-Dunham stock at the present time. The trustees may in the exercise of their fiduciary duties sell property held in trust at any time called for by circumstances, without the necessity of obtaining judicial authorization. See Trust Code, passim. However, to protect Ted F. Dunham and Richard E. Dunham fully in their interests as forced heir-beneficiaries, we reserve their right to proceed in the trial court to obtain an order compelling the trustees to sell the subject stock in Anderson-Dunham, if within a reasonable time Anderson-Dunham has still failed to pay dividends commensurate with principal.

REMOVAL OF MRS. DUNHAM AS EXECUTRIX AND MRS. DUNHAM AND MR. ALEXANDER AS TRUSTEES
As we have stated, the Dunham legatees have sought the removal of Mrs. Dunham as executrix and of Mr. Alexander and Mrs. Dunham as trustees. The trial court refused to remove Mrs. Dunham as executrix on the basis of the holdings in the Succ. of Kaffie, 273 So.2d 318 (La.App. 3d Cir. 1973), writ refused 276 So.2d 701 (1973), and Succ. of Favalora, 169 So.2d 197 (La. App. 4th Cir. 1964), writ refused 247 La. 355, 171 So.2d 476 (1965).[2] In these two cases an apparent conflict of interest arose between the heirs and the succession representative. The Court held that a mere conflict of interest between the succession representative and the heirs was insufficient ground for removal of the succession representative. In the present case, much more has been shown than mere animosity or conflict of interest between Mrs. Dunham and the legatees. In the present case, Mrs. Dunham actively breached her fiduciary duty as executrix, as we have indicated, in permitting the stock redemption to take place, which constituted a failure to preserve the succession assets, and thus, mismanagement of the estate. A succession representative may be removed under the Code of Civil Procedure for mismanagement of the estate (art. 3182). The trial court was, therefore, incorrect in refusing to remove Mrs. Dunham as executrix, and its judgment on this point should be reversed.
The trial court removed Mrs. Dunham and Mr. Alexander as trustees of the trusts for the two sons, but refused to remove them as trustees of the trusts for the grandchildren. We hold that they should have been removed as trustees of all trusts.
The trial court properly noted that only two cases have dealt with the removal of a trustee. These are Succ. of Supple, 274 So.2d 790 (La.App. 4th Cir. 1973), and Holladay v. Fidelity National Bank, 312 So.2d 883 (La.App. 1st Cir. 1975). In the first of these cases, it was held that mere animosity was insufficient ground for the removal of a trustee. The second case considers various possible grounds for the removal of a trustee, none of which is here pertinent. In the present case, although animosity must be said to exist, much more than animosity exists. First, we note that in traditional trust law animosity that colors the judgment *454 of the trustee is grounds for removal. Restatement of Trusts, Second, Sec. 107, Comment c. Oppenheim and Ingram in their Treatise on Trusts (Louisiana Civil Law Treatise, Vol. 11; Trusts), Sec. 136, indicate this view would be followed by Louisiana courts. It is shown that Mrs. Dunham and Mr. Alexander conveniently delayed their acceptances of the trusts for the two sons until such time as the stock redemption had taken place. The sale took place February 27, 1978, and the pleadings and briefs show that Mrs. Dunham and Mr. Alexander did not accept the trusts until shortly after the sale had taken place. It was their duty either to have recused themselves as trustees as it is obvious that they intended to accept the trusts as soon as the redemption had taken place, or to have accepted the trusts and actively opposed the sale in their capacities as trustees. They did neither. Rather than opposing the sale or recusing themselves, as would appear to have been the more proper course, they did nothing, thereby permitting the succession and the trusts to sustain a substantial injury. This was a breach of their fiduciary duties as trustees, having been both a breach of the duty to act prudently in selling investments (LSA-R.S. 9:2127) and their duty to administer the trust solely in the interest of the beneficiaries (LSA-R.S. 9:2082), as the sale benefited Mrs. Dunham as shareholder and strengthened Mr. Alexander's position as corporate president. Also, as trustees it was their duty to have caused the principal trust property, stock in Anderson-Dunham, to be productive of income. Income from the stock to the trusts would necessarily have had to have been in the form of dividends distributed by Anderson-Dunham. Trustees are under a duty to take reasonable steps to obtain possession of legacies. Comment (c) under LSA-R.S. 9:2091. It was the trustees' duty to have exerted pressure by threatening to demand delivery of the legacy, viz. corporate stock in trust, thereby influencing the corporation to distribute dividends, or to demand delivery of the stock from Mrs. Dunham in her capacity as executrix, so that the trustees could vote the stock in such a manner that the corporation would declare dividends. They did neither. Thus, they again breached their fiduciary duty. We, therefore, hold that the trial court was correct in removing Mrs. Dunham and Mr. Alexander as trustees of the trusts for the two children. Likewise, we find that they should have been removed as trustees of the trusts for the six grandchildren. The same injury that occurred to the children also occurred to the grandchildren. The grandchildren also suffered from Mrs. Dunham's and Mr. Alexander's failure as trustees to oppose the sale of the stock as the stock redemption, or to recuse themselves. The grandchildren also suffered from the failure of the corporation to declare dividends. It is, therefore, apparent that Mrs. Dunham and Mr. Alexander should be removed as trustees of the grandchildren's trusts as well.
As we have indicated, the Louisiana National Bank was appointed co-trustee with Mrs. Dunham and Mr. Alexander in the place and stead of Fidelity National Bank, which was designated co-trustee in Mr. Dunham's will. As the removal of the Louisiana National Bank was not sought, we make no determination on its acting as trustee.

VALUE OF ESTATE PROPERTY
We find no manifest error in the trial court's findings on valuation. See Canter v. Koehring Co., 283 So.2d 716 (La. 1973). Hence, we adopt its reasons for judgment on that question as part of this opinion, and quote as follows:
"The valuation of the decedent's home, its contents, and the Anderson-Dunham office building are questioned by Richard and Ted Dunham, Jr. Although of relative unimportance to other substantial issues raised in the case, the significance of the valuations is rooted in the nature of the decedent's dispositions of his estate. Ted Dunham, Sr. bequeathed his community one-half interest in the home and its furniture to his widow and the naked title interest in trust to one of his granddaughters. He then bequeathed the residuum of his estate in the proportion of *455 an undivided one-fourth of his net estate to each of his two children in separate trusts. The remainder of the residium was placed in separate trusts to six of his grandchildren. Consequently, to the extent that the values of the particular bequests to the decedent's widow are increased, there is a corresponding increase in the one-fourth of the net estate bequeathed to the children as their legitime, and, accordingly, the overall result is to effect a reduction from the bequests to the trusts for the grandchildren. Therefore, as pointed out by counsel for the executrix, the contest as to the valuation is between the trusts established for the children and those established for the grandchildren.
"Pursuant to the authority of Code of Civil Procedure Article 3136, Mrs. Dunham filed a detailed descriptive list in which all of the assets of the estate of Ted Dunham, Sr. were described and a valuation was placed on each. After this litigation was instituted, upon the request of Richard Dunham, this Court ordered an inventory be taken. A substantial difference in the valuations of the Dunham residence, its contents, and the Anderson-Dunham office building were evidenced as compared with those recited in the earlier detailed descriptive list. Counsel for Richard and Ted Dunham, Jr. contend that the values stated in the inventory represent the fair market value of those items, whereas counsel appointed for the six trusts established for the grandchildren and counsel for Mrs. Dunham assert that the values contained in the detailed descriptive list are the most accurate.
"The first question is what standard should be considered for purpose of establishing a valuation. Civil Code of Procedure Article 3136 states the succession property shall be set forth at `the fair market value of each item thereof at the date of the death of the deceased.' Civil Code of Procedure Article 3133 in referring to the proces verbal of the inventory, states that it shall contain an adequate description of each item of property at `the fair market value' estimated by the appraisers. Further, Civil Code of Procedure Article 2952, set forth in the section of the Code relating to state inheritance tax provides that the detailed descriptive list shall state `the actual cash value' of each item at the time of the death of the deceased. The Court is of the opinion that fair market value is the proper measure to be utilized for establishing the value of the property. The time honored definition of fair market value is `the value arrived at as between a willing buyer and a willing seller, neither of whom is under any compulsion to buy or sell.' Recreation & Parks Commission v. Gully & Associates, Partnership No. 5, 303 So.2d 827 (La.App. 1st Cir. 1975); also, Fletcher v. Smith, 216 So.2d 663 (La.App. 3rd Cir. 1978). Since the same appraisers were used for both pieces of real estate, the Court will first consider the valuations relating to that property.
"Essentially, a court must place its reliance on the expertise of an appraiser in establishing values. The weight of opinion testimony is determined by the professional qualifications and experience of the expert, the facts and studies upon which his opinions are based, and in case of land appraisals, his familiarity with the location. State, Department of Highways, v. Terrebonne, 349 So.2d 936 (La. App. 1st Cir. 1977).
"The realtors whose opinions formed the basis for the detailed descriptive list, as well as the appraisers whose valuations were used for the inventory, are truly among the most well recognized and outstanding persons in their fields. Heidel Brown and Verdie Reese Perkins furnished the values for the residence and the office building located on Florida Boulevard. Both have had extensive experience as appraisers, but probably they are better known for being the leaders in the field of large residential and commercial sales operations. In addition, each has had some personal experience in the sale of property in locations surrounding the subject property. In fact, Mr. Perkins *456 was involved in the original sales transactions of both of subject properties. On the other hand, Julius Bahlinger and Oren Russell, who made the appraisal of the properties for the inventory, have firmly established themselves as the premier appraisers in expropriation cases. However, it must be observed that neither has handled the volume of residential and commercial sales as have Brown and Perkins, and with the exception of one sale by Russell, nor have they handled personally any sales in the area of these properties. Two other factors which have been considered by the Court in assessing the relative merit of their respective opinions are that, while Perkins' and Brown's appraisals were the most contemporaneous as to the date of the death of decedent, the effect of the estate taxes no doubt may have subjectively influenced the appraisal placed on the properties by them. But in the final analysis, the personal sales experience of Brown and Perkins in the locality of subject properties is a decisive factor in the Court's acceptance of their appraisals for purposes of establishing a fair market value of the properties.
"The residence constructed by Ted Dunham, Sr. was built in the early 1950's and was among the finest constructed in Baton Rouge up until that time. It is situated on the Capitol Lake with a superior view of the State Capitol and its magnificent setting. It is located in a small, but prestigious subdivision. Unfortunately, it is located immediately on the fringe of an industrial area and it wants for a more favorable access. Brown and Perkins placed a value upon it at $180,000.00, whereas Bahlinger and Russell fixed its value at $237,000.00 and $244,000.00, respectively. While the replacement cost of the house would be substantial and it has been well maintained, and, as such, the adjusted value determined by both Bahlinger and Russell is consistent with the amounts which they reached, the Court believes, as maintained by Brown, that there is very little market for the residence due to its location. The probability is very strong that if this house were relocated in one of the better subdivision (sic) in southeast Baton Rouge, it would be worth half again the value placed by Perkins and Brown and possibly Bahlinger and Russell. But, such is not the case. Due to the lack of a market, the Court chooses to let the original value set forth in the descriptive list stand.
"The office building located on Florida Boulevard is the home of Anderson-Dunham and is a well constructed commercial building. It is located in the heart of a once thriving commercial area, which has declined in the last few years. This is attested to by the few sales which have taken place in the area and inability of any of the appraisers to obtain a number of comparables in the immediate vicinity. Brown and Perkins fixed the value of this office building at $140,000.00, while Bahlinger and Russell placed the value at $192,500.00 (after adjustments for a lot in the rear) and $182,500.00, respectively. While both Bahlinger and Russell were very thorough in their study of the valuation of this property, the Court is greatly influenced by the personal knowledge of both Brown and Perkins relative to property values in the vicinity and the lack of a market as it affects the value of the property. The Court finds no reason to disturb the original value stated in the detailed descriptive list.
"From its own personal observation, the Court knows that Ted and Katharine Dunham spared nothing in providing their home with expensive furniture. Even to the inexperienced, the place had an air of oppulence and wealth. Therefore, the Court was quite frankly amazed that the entire furnishings and appointments were valued at only $24,000.00 by Winnifred Lucas whose valuation was used for the detailed descriptive list. Mr. Vaughn Barber and Mr. William Dunn Ray, who were engaged for the inventory, fixed the values of the movables at $104,450.00 and $102,790.00, respectively.

*457 "Mrs. Lucas is well known for her talent and taste in home furnishings and there can be no question as to her superior experience in the field as compared with the other two appraisers. However, the Court believes, as did court appointed counsel for the trusts, that the reason why there was such a substantial disparity between the appraisals was that Mrs. Lucas, along with Mr. Preis, who are dealers in home furniture and furnishings, were testifying what they, themselves, would pay for all of these items if sold in globo, whereas Barber and Ray were valuing the items on an individual retail basis. Mrs. Lucas testified that she would have put a 100% markup on the items if they were sold by her through her shop. She candidly admitted, in response to a question put to her by the Court, that the furnishings should be insured for considerably more than her appraisal. The Court believes that a fair market value of the movables contained in the Dunham residence at the time of the death of Ted Dunham, Sr. was somewhere between the estimates of Mrs. Lucas and the appraiser for the inventory. For want of a better amount, the Court adopts Mrs. Lucas' opinion of `100% markup' on her original estimate as a fair market value and revises the valuation of the movables in the residence from $24,000.00 to $48,000.00."

DECREE
The judgment of the trial court is reversed insofar as it decrees that 490 shares of the capital stock of Anderson-Dunham, Inc. represented by Certificate No. 3, is the separate property of Mrs. Katharine O. Dunham, and judgment is hereby rendered decreeing the Succession of Ted F. Dunham, Sr. to be the owner of the said 490 shares of stock. Accordingly, Certificate No. 3 representing 490 shares of the capital stock of Anderson-Dunham, Inc. is hereby ordered included in the descriptive list and inventory of properties of this Succession as the separate property of the late Ted F. Dunham, Sr.
The judgment of the trial court is affirmed insofar as it decrees that the 1,000 shares of the capital stock of Anderson-Dunham, Inc. acquired by the late Ted F. Dunham, Sr. from James L. Anderson was the separate property of the said Mr. Dunham.
The judgment of the trial court is affirmed insofar as it decrees that Anderson-Dunham, Inc. is the sole owner of all of the outstanding shares of the capital stock of Dunham Land, Inc.
The judgment of the trial court is affirmed insofar as it denies the claims by any party in this case to annul and set aside the sale, by way of stock redemption of 394 shares of the capital stock of Anderson-Dunham, Inc. by this Succession to Anderson-Dunham, Inc. as authorized by judgment in these proceedings signed August 7, 1977. The said judgment, however, is hereby amended to recognize and expressly reserve the right of Ted F. Dunham, Jr. and Richard E. Dunham to obtain damages from Mrs. Katharine O. Hall Dunham as executrix for failure to administer the succession properly.
The judgment of the trial court is affirmed insofar as it decrees that the respective bequests by the deceased in his testament to Ted F. Dunham, Jr., in trust, and to Richard E. Dunham, in trust, impinge on the legitime of the said Ted F. Dunham, Jr. and Richard E. Dunham, and holds that it is premature to grant relief in the form of terminating the trusts or ordering the sale of the stock in Anderson-Dunham, Inc. Judgment is hereby rendered reserving to Ted F. Dunham, Jr. and Richard E. Dunham, the right to proceed in the trial court to obtain an order compelling the trustees to sell the subject capital stock in Anderson-Dunham, Inc., if within a reasonable time the said corporation has failed to pay dividends commensurate with principal.
The judgment of the trial court is reversed insofar as it denies the petition to remove Mrs. Katharine O. Dunham as executrix of this Succession, and judgment is hereby rendered removing the said Mrs. Katharine O. Dunham as executrix of the *458 Succession of Ted F. Dunham, Sr., and remanding this case to the lower court for appointment of a testamentary executor in accordance with law.
The judgment of the trial court is affirmed insofar as it removes Mrs. Katharine O. Dunham and Mr. Billy J. Alexander as trustees of the two testamentary trusts created by the deceased with Ted F. Dunham, Jr. and Richard E. Dunham as principal and income beneficiaries, respectively, and insofar as it appoints the Louisiana National Bank of Baton Rouge as trustee of these two said trusts.
The judgment of the trial court is reversed insofar as it denies the petition to remove Mrs. Katharine O. Dunham and Mr. Billy J. Alexander as trustees for the six separate testamentary trusts created by the deceased with the following named persons as principal and income beneficiaries:
(a) Lezle Faye Dunham
(b) Kara Lea Dunham
(c) Vanessa Malone Dunham
(d) D'Ann Dunham Sharp
(e) Kathryn Lynn Dunham Whitty
(f) Richard Elliott Dunham, Jr.
The judgment of the trial court is affirmed insofar as it appoints the Louisiana National Bank of Baton Rouge as trustee of these trusts. Judgment is hereby rendered removing the said Mrs. Katharine O. Dunham and Mr. Billy J. Alexander as trustees of these six trusts, and remanding this case to the lower court for the appointment of one or more successor trustees to Mrs. Dunham and Mr. Alexander, if the court finds it necessary or desirable in accordance with law.
The judgment of the trial court in regard to the valuation of the succession assets, the fixing of witness fees, and the taxing of those fees as costs is affirmed.
All costs of these proceedings, both in the trial court and on appeal, are to be paid in the proportion of one-third each by (1) the Succession of Ted F. Dunham, Sr.; (2) Mrs. Katharine O. Dunham; and (3) Ted F. Dunham, Jr. and Richard E. Dunham.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
NOTES
[1] With deduction for the surviving spouse's usufrct, a problem that does not concern us here.
[2] The trial court also cited Succ. of Houssiere, 247 La. 764, 174 So.2d 521 (1965), which it stated held (1) that the succession representative should not be removed for anticipated mismanagement, and (2) that the wishes of the decedent should be respected in maintaining the appointment of a succession representative. There is no language in the holding of Houssiere that would tend to support the second purpose for which it is cited, although we believe the second proposition is correct, in the absence of mismanagement, which, as we shall see, was present in Dunham. As to the first proposition, we note in the present case, as we shall see, there was mismanagement in the past, and not merely anticipated mismanagement in the future.