417 So.2d 1221 (1982)
SUCCESSION OF Ethel R. SKYE,
Mary E. MAYCOCK, Plaintiff-Appellant,
v.
William E. SKYE, et al., Defendants-Appellees.
No. 8700.
Court of Appeal of Louisiana, Third Circuit.
June 24, 1982.
Rehearing Denied August 30, 1982.
*1224 Nelson A. Moak, Benton, for plaintiff-appellant.
William E. Skye, Alexandria, for defendants-appellees.
Before DOMENGEAUX, FORET and LABORDE, JJ.
FORET, Judge.
This is the second time this matter has been before us. The first time around:[1] Mary Elise Maycock (Plaintiff) filed a rule to show cause why the succession (the succession) of her mother, Ethel R. Skye (decedent), should not be re-opened and why certain judgments rendered in the succession proceedings should not be recalled, annulled, and set aside. Plaintiff also sought to have William Skye (the Executor) show cause why he should not be removed from office and the court should not appoint an independent administrator of the succession for the purposes of auditing the succession records and the assets and liabilities of the decedent. Named defendants were: Jack B. Skye, individually and as administrator of the estate of his minor son, Robert A. Skye; and William E. Skye, individually and as natural tutor of his minor daughter, Julie R. Skye.
In response to the filing of a dilatory exception of unauthorized use of summary proceedings, plaintiff converted her action to an ordinary proceeding. Defendants answered plaintiff's original petition and brought a reconventional demand against her.
The trial court, after trial on the merits, rendered judgment against plaintiff, dismissing her action with prejudice. The trial court's judgment makes no mention of defendants' reconventional demand. Plaintiff then perfected a devolutive appeal to this Court. In Succession of Skye, 364 So.2d 1357 (La.App. 3 Cir. 1978), we reversed the trial court's judgment and remanded this entire matter with instructions that the succession be re-opened and that all final judgments previously signed in this matter be vacated and set aside.
On this, the second time around: plaintiff filed a statement of opposition to the petition for homologation of the executor's final account in which she made numerous objections to the proposed disbursements of succession assets. Plaintiff also filed another rule to show cause why William Skye should not be removed as executor of the succession and why a bank and trust company of Rapides Parish should not be appointed executor.
The second trial of plaintiff's action resulted in a judgment by the trial court again dismissing her action with prejudice. That judgment further ordered plaintiff to collate to the succession the sum of $22,628.97, either in money or by taking less in property from the succession, with plaintiff to make this election within three days from the date that notice of judgment was served upon her attorney. If she failed to make the election within that time period, then it would be considered that the trial court rendered a personal money judgment against her for that amount.
Plaintiff appeals and raises the following issues:
(1) Whether the trial court should have ordered a continuance because there were certain motions and exceptions pending and undisposed of, when the case was called for trial;
(2) Whether the trial court erred in refusing to allow plaintiff to introduce evidence and testimony concerning *1225 collation due the succession from William Skye and Jack Skye;
(3) Whether collation is due the succession from William Skye and Jack Skye;
(4) Whether the trial court committed manifest error in finding that a check made payable to plaintiff by decedent in the amount of $10,000 is subject to collation;
(5) Whether the trial court committed manifest error in finding that the cash value of or loans taken out on two life insurance policies on decedent, which were given to plaintiff prior to decedent's death, are subject to collation;
(6) Whether the trial court committed manifest error in finding that plaintiff had failed to prove that a debt of $526.58, allegedly owed by the succession to a joint venture known as "Skye and Bauer", was improperly placed on the executor's tableau of distribution;
(7) Whether the trial court committed manifest error in finding that the payment of $50 per month to Lena Williams by the executor from the proceeds of a promissory note made in the amount of $7,500 to decedent by Skye Realty is proper;
(8) Whether the trial court committed manifest error in finding that William Skye was entitled to receive both an executor's fee and an attorney's fee for administering the succession;
(9) Whether the trial court committed manifest error in finding that William Skye had properly sold decedent's home to himself;
(10) Whether the trial court committed manifest error in finding that certain immovable property, in which decedent owned an undivided one-half interest, did not properly belong in these succession proceedings;
(11) Whether the trial court committed manifest error in finding that the sum of $10,575.98 was properly listed on the executor's tableau of distribution as a debt of the succession owed to William Skye pursuant to a verbal partnership agreement allegedly entered into between himself and decedent;
(12) Whether the trial court properly approved a boundary agreement executed by the executor and a neighboring landowner which resulted in the succession losing 17.3 acres, when no dispute as to the boundary is alleged to have existed and there was no basis for any dispute;
(13) Whether the trial court committed manifest error in finding that a verbal agreement to partition immovable property between William Skye and decedent as co-owners should be given effect;
(14) Whether certain succession property was properly partitioned between the heirs;
(15) Whether the trial court committed manifest error in finding that the proceeds from the sale of decedent's home had been properly distributed among the heirs in accordance with the provisions of decedent's will;
(16) Whether certain cemetery plots should have been listed in the sworn detailed descriptive list as property owned by the decedent prior to her death; and;
(17) Whether the trial court erred in decreeing that plaintiff had three days, after the date on which her attorney received notice of judgment in this matter, to elect to collate in money, or by taking less property from the succession, in default of which a personal money judgment would be rendered against her.
Defendants have answered the appeal seeking to have the trial court's judgment amended to provide for legal interest on the amount to be collated by plaintiff with such interest to run, either from the date of decedent's death, or the date of the filing of defendant's reconventional demand for collation.

*1226 FACTS
The facts leading up to our earlier reversal and remand of this action to the trial court are set forth in Succession of Skye, supra, and we see no need to repeat them. We will proceed to a determination of the issues presented and supply any facts deemed pertinent to a resolution of a particular issue.

TRIAL COURT'S REFUSAL TO ORDER A CONTINUANCE
Plaintiff contends that the trial court violated one of its own rules when it refused to order a continuance of this matter even though certain exceptions and motions were pending and undisposed of at the time of trial. It is correct, as argued by plaintiff, that rules of court have the effect of laws, both upon the judge and litigants. See Interdiction of Wenger, 147 La. 422, 85 So. 62 (1920); Trahan v. Petroleum Casualty Company, 200 So.2d 6 (La.1967); Sciortino v. Sciortino, 250 La. 727, 198 So.2d 905 (1967)[2].
However, the rules of the Ninth Judicial District Court form no part of the record before us and we are unable to take judicial notice of them. See Succession of Scardino, 215 La. 472, 40 So.2d 923 (1949); Sciortino v. Sciortino, supra; Trahan v. Petroleum Casualty Company, supra. Thus, we are unable to make any determination regarding this particular issue.
Plaintiff does argue that there were other adequate grounds upon which the trial court should have granted a continuance. LSA-C.C.P. Article 1601 provides that a trial court may grant a continuance if there is good ground therefor. Plaintiff's counsel argues that he had only sixty days to prepare for the trial of this matter and that this time period was inadequate to do so because of the voluminous record in this case. Plaintiff's counsel also argues that he had been unable to complete discovery in time for trial and was unprepared for trial as a result thereof.
We have reviewed the record and find no abuse of discretion by the trial court in refusing to grant plaintiff's request for a continuance.

TRIAL COURT'S EXCLUSION OF EVIDENCE OF COLLATION ALLEGEDLY DUE FROM DEFENDANTS.
Plaintiff contends that the trial court erroneously refused to allow her to present evidence concerning collation due the succession from William and Jack Skye. Defendants objected to the introduction of any evidence concerning collation due by them on the grounds that such evidence was irrelevant and immaterial as plaintiff had allegedly failed to raise any issue concerning this in her pleadings. The trial court sustained the objection, but allowed some evidence concerning this issue to be introduced under a proffer of proof.
The record shows that William Skye filed a motion to consolidate, for trial, Succession of Ethel R. Skye, Probate Docket # 16,111, Ninth Judicial District Court, Parish of Rapides, State of Louisiana, with Mary S. Maycock v. Succession of Ethel R. Skye and William E. Skye, Civil Docket # 118,290, Ninth Judicial District Court, Parish of Rapides, State of Louisiana. The motion was granted by the trial court. Thus, plaintiff's answer to defendant's reconventional demand, found in the record of the former suit, was a pleading which should have been considered by the trial court. Paragraph 4 of that pleading reads as follows:

"4.
That in the alternative and in the event any collation whatsoever is required to this succession that plaintiffs in reconventional be likewise required to collate all gifts, advantages and donations to them by the decedent which will be more particularly shown following an audit of the decedent's estate."
LSA.-C.C.P. Article 862 provides:

*1227 "Art. 862. Relief granted under pleadings; sufficiency of prayer
Except as provided in Article 1703, a final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings and the latter contain no prayer for general and equitable relief."
Greer v. Continental Casualty Company, 347 So.2d 70 (La.App. 2 Cir. 1977), stated, on page 72, that:
"We abandoned the theory of the case pleading and in recent years have liberally construed our procedural laws to allow consideration of any cause of action or defense, even if not properly labeled or prayed for, if the pleadings, taken as a whole, contain sufficient factual allegations to afford fair notice to the adverse party of the relief sought. See C.C.P. 862; Terral v. Bearden, 338 So.2d 141 (La.App.2d Cir. 1976) and cases cited therein."
We find that the allegations of paragraph 4 of plaintiff's answer to defendants' reconventional demand afforded fair notice to them that collation was being sought of all gifts, advantages, and donations made to them by decedent. Thus, it was error for the trial court to refuse to allow plaintiff to introduce evidence concerning collation due by defendants.
The trial court did allow plaintiff to place letters written by decedent in the record in which she mentions certain gifts made by her to defendants. In addition, the trial court allowed plaintiff to testify, under a proffer of proof, as to gifts made by decedent to defendants. Plaintiff could have called William and Jack Skye to testify under cross-examination during her proffer of proof, but failed to do so. There were other instances during the trial of this matter, when plaintiff attempted to cross-examine William Skye as to any collatable gifts he may have received from decedent, but she was prevented from doing so by the trial court. Again, plaintiff could have cross-examined William Skye under a proffer of proof, but failed to do so.
We find that plaintiff failed to prove that either William or Jack Skye received gifts from decedent which were subject to collation.

DECEDENT'S $10,000 GIFT TO PLAINTIFF
Plaintiff contends that the trial court committed manifest error in finding that she must collate $10,000 given to her by decedent in the form of a check. Plaintiff argues that this check was given to her as a birthday gift and can in no way be considered an advance on that which she would later inherit from decedent. Plaintiff relies on the provisions of LSA-C.C. Articles 1244 and 1245 in support of her argument.
LSA-C.C. Article 1244 provides:
"Art. 1244. Expenditures not subject to collation
Art. 1244. Neither the expenses of board, support, education and apprenticeship are subject to collation, nor are marriage presents which do not exceed the disposable portion."
LSA-C.C. Article 1245 provides:
Art. 1245. Manual gifts
Art. 1245. The same rule is established with respect to things given by a father, mother or other ascendant, by their own hands, to one of their children for his pleasure or other use."
It would seem that LSA-C.C. Article 1245 exempts manual gifts from the rules regarding collation. However, Succession of Gomez, 223 La. 859, 67 So.2d 156 (1953), decided otherwise. Gomez noted, on page 157, that:
"The question of whether manual gifts are exempt from collation has never, so far as we can ascertain, been adjudicated directly by this court."
Gomez conceded that, "The problem before us in this case is extremely difficult...", and then provided a brief review of the history surrounding the concept of collation. After tracing the development of the law of collation from Roman and *1228 French sources, Gomez undertook a detailed discussion of the law of this State, stating, at pages 160-162, that:
"The things exempt from collation in our Code of 1808 were substantially the same as those in the French Code, though our Code was somewhat more liberal in its view of what were usual gifts and was more detailed in its language, thus:
`Art. 207. There exists however one sort of advantage made by ascendants to their children or lawful descendants, which by their privileged nature, are not subject to collation, though it cannot be said they were not taken out of the mass of the donor's estate.
`Thus pensions, aliments and maintenance supplied to children, and books and other expenses laid out for their education, are not liable to collation, though a library is.
`No collation is due to the wedding clothes and wedding expenses; but the trousseau of the daughter is liable to it.
`New year's gifts and small presents, money given to the minor and by him spent and even money given to the son of age, for play and for his pleasures, are not subject to collation."
`Art. 208. But the child is obliged to collate what has been spent to provide him a living or instruct him in some trade or profession or to give him a dowry or marriage portion. * * * `
The redactors of the Code of 1808 evidently recognized that American parents were more generous and liberal with their children, did not confine their giving of presents to special occasions, and often gave money to children for their play and pleasure. The fourth paragraph of our Article 207 contained a deliberate departure from the French view that even a sum of money given to the heir for his small pleasures was subject to collation, because there was nothing habitual about it in France and it was not imposed by usage. See Baudry-Lacantinerie et Wahl, loc. cit. supra.
The Code of 1808 did not expressly exempt manual gifts from collation, and the language of the articles in that Code does not permit even by implication the interpretation that manual gifts were exempt because of the one fact that they were manual gifts.
Articles 1322 and 1323 of the Code of 1825 contained the exemption provisions of that Code. Since those articles are identical with Articles 1244 and 1245 of our present Civil Code, what we hereafter say as to the provisions of the 1825 Code is pertinent and applicable to the present provisions.
The redactors of the Code of 1825 considered that the articles of the Code of 1808 were too wordy and detailed, and they explained in their project that they `suppressed these articles to place them in a different order from that which they occupy in the Code [of 1808], and to abridge some dispositions which are too much overloaded with details. Here follow the articles which we have substituted for them [Articles 1322 and 1323 of the Code of 1825].' 1 Louisiana Legal Archives, Project of the Code of 1825, p. 182.
The redactors themselves, then, did not indicate that they had changed in any way the law relating to things exempt from collation in the Code of 1808. The redactors of the Code of 1825 were men learned in the law, and they were familiar with the term `manual gift', for they mentioned it expressly when they defined it in Article 1526 of that Code. If they had intended to exempt manual gifts as such from collation, they could very easily have made that intention clear. After providing that the expenses of board, etc., are not subject to collation, they undoubtedly would have said simply, in Article 1323, `The same rule is established with respect to manual gifts' instead of saying `The same rule is established with respect to things given by a father, mother or other ascendant, by their own hands, to one of their children for his pleasure or other use'. Their express purpose for abridging these dispositions was to improve those overloaded with detail. If such was their purpose, and they intended to exempt manual gifts, why did they *1229 overload this disposition by the use of the limiting phrase `for his pleasure or other use'? What possible difference would the purpose of the giving make if manual gifts as such were exempt?
When the redactors used the expression `by their own hands, to one of their children for his pleasure or other use', they were contemplating those things usual for parents of this country to give to a child without thought or regard to his having to account for them to his co-heirs. The word `pleasure' has special significance in this respect because it best describes the motive that usually prompts the giving of such things. The language the redactors chose to describe this kind of giving was broad and elastic enough to keep apace of changes in our social development.
We have concluded, therefore, that it was never the intention and purpose of the redactors of the Code of 1825 to make a drastic change from the provisions of the 1808 Code relating to exemptions or, for that matter, a radical departure from our fundamental concept of collation. Any other conclusion would be inconsistent with the emphasis on equality in the general provisions relating to the nature of collation and the strict rules for maintaining that equality. Legal exemptions from collation have always been based on the soundest groundsthe things exempt were by their nature not really advancements because they were obligations of the parent, or they were things given under such circumstances as to overcome the presumption that they were advancements. The exemption of manual gifts as such cannot be justified under either of these theories, and no consideration comes to our minds which would have prompted the redactors to foster inequality by providing a meansthe manual giftwhereby a large portion of an estate could be given to a descendant free of the obligation of collation by virtue of the law." (emphasis ours.)
Having determined that LSA-C.C. Article 1245 makes no exemption from collation for a donation inter vivos made by an ascendant to a decedent merely because it was made in the form of a manual gift, Gomez then proceeded to a determination of the following issue:
"Must the dispensation from collation of a manual gift, which is subject to no formality, be made expressly and by the formality of a notarial act, under Article 1232 of the Civil Code?"
Noting the various solutions proposed by the French writers and authorities to this problem and the lack of guidance provided by the Louisiana Civil Code, Gomez stated, at pages 163 and 164, that:
"In this case we could solve the problem in one of two ways. First, we could hold that, since the manual gift (for which no form is required) is not exempt by law from collation, its dispensation from collation must be established in the manner and form provided by Article 1232 of our Civil Code, that is, by a declaration that the donation is an advantage or extra portion made in a written act before a notary and two witnesses. Second, we could hold that the donor's intent to dispense collation of a manual gift could be established by the facts and circumstances of the case. Under this latter holding the donee would have the burden of establishing the intent to dispense by strong and convincing proof so as to overcome the presumption of collation, for under our law, where the donor has remained silent, collation is always presumed. Art. 1230, Civil Code." (emphasis ours.)
Gomez found no need to choose between either solution because the party seeking exemption from collation was unable to prove the existence of either and collation was ordered.
In the action before us, the trial court found:
"The evidence presented by Mrs. Maycock failed to show that the $10,000 check was not to be collated."
Plaintiff introduced in evidence a birthday card sent to her by decedent, in which decedent informed her that she had planned to *1230 send the $10,000 check to plaintiff for her birthday, but decided to hold on to the money for a while to collect extra interest. Decedent sent the check to plaintiff some five months after plaintiff's birthday. Plaintiff also introduced in evidence certain letters written by decedent in which she stated, among other things, that she was giving plaintiff the $10,000 to make up for the fact that plaintiff had failed to receive any portion of her brother's property after his death. There were other letters written by decedent, in which decedent clearly and unequivocally expressed that plaintiff was being given the $10,000 because decedent had given many gifts and done many things for her other children.
Darby v. Darby, 118 La. 328, 42 So. 953 (1907), concerned a situation similar to the one presently before us. In Darby, an act of donation was introduced in evidence and recited the following:
"`Mrs. Coralie Fuselier Darby, who declared that inasmuch as she has previously accounted to all her children named as follows, to wit, Felecie Darby, widow of Louis De Blanc deceased, Miss Coralie Darby, Mrs. Constance Darby, deceased wife of Leon Séré, also deceased, Paul Darby, George Darby, and given to each money or property amounting in each case to more than two thousand five hundred dollars, and having given nothing to her son, Octave Darby, it is her wish and intention to place him upon footing equal to her other children, and to equalize the advance in money and otherwise which she has made to her other children as named and for that purpose, to place the said donee upon a footing equal with said other children, it was her intention to make, and she does make, a donation inter vivos unto her son, Octave Darby, who is here present accepting for himself and his heirs and assigns, the following described property, to wit.'"
Darby held, at pages 954 and 955, that:
"Suffice it to say that the mother considered that these advantages were such as called for an equalization, and she made her donation accordingly; and that therefore her intention was that defendant should have this property over and above his share in her succession. Whether she was mistaken or not in supposing the said advantages which her other children had received were such as, in law or in fact, called for an equalization, is absolutely immaterial, since we are concerned only with her intention, and such intention is clearly and unmistakably expressed, and it is that defendant should have this property in addition to his share in her succession. Perhaps she made the donation for the very reason that she knew that the advantages received by her other children were not collatable, and that therefore something should be done by her to bring about an equality which was demanded by equity, but not exigible as a matter of legal right."
It is our opinion that, under the facts and circumstances of this case, plaintiff (the donee) has proven by clear and convincing evidence that decedent (the donor) intended to dispense from collation, the $10,000 she gave plaintiff in the form of a manual gift. The trial court's finding to the contrary is clearly wrong.

THE INSURANCE POLICIES
Plaintiff contends that the trial court committed manifest error in finding that she must collate the cash value or loans received by her on certain life insurance policies. William Skye testified that during decedent's lifetime she gave plaintiff $3,998 represented by the total cash value of a life insurance policy issued by the Mutual Life Insurance Company of New York (Mutual) on decedent's life, and that plaintiff cashed this policy, receiving the proceeds therefrom. A letter from Mutual, introduced in evidence, states that the ownership of this policy was transferred to plaintiff, but it failed to state from whom it was transferred.
William Skye then introduced in evidence a check made payable to him in the amount of $5,963.12 by the Travelers Insurance Company representing a loan made against *1231 a life insurance policy issued by that company on decedent's life. He had given the check to plaintiff. He admits that he was the owner of that policy, but states that it was for "tax reasons" only. The evidence shows that he later transferred the ownership of that policy to plaintiff, at which time she received another loan of $2,667.68 made against the policy. Finally, William Skye testified that plaintiff received a check in the amount of $1,432.76 from the Travelers Insurance Company representing the remaining proceeds payable under the policy upon decedent's death. Defendants sought to have plaintiff collate all of these amounts, except for the $1,432.76 plaintiff received as death benefits under the Travelers Insurance Company policy. The trial court agreed and ordered plaintiff to collate these amounts.
LSA-C.C. Article 1227 provides:
"Art. 1227. Collation, definition
Art. 1227. The collation of goods is the supposed or real return to the mass of the succession which an heir makes of property which he received in advance of his share or otherwise, in order that such property may be divided together with the other effects of the succession."
LSA-C.C. Article 1228 provides:
"Art. 1228. Collation by descendants
Art. 1228. Children or grandchildren, coming to the succession of their fathers, mothers or other ascendants, must collate what they have received from them by donation inter vivos, directly or indirectly, and they can not claim the legacies made to them by such ascendants unless the donations and legacies have been made to them expressly as an advantage over their coheirs, and besides their portion.
This rule takes place whether the children or their descendants succeed to their ascendants as legal or as testamentary heirs, and whether they have accepted the succession unconditionally, or with the benefit of inventory." (Emphasis ours.)
We fail to see the basis for defendants' claim that plaintiff must collate the cash advances or loans made to her against the Travelers Insurance Company policy. That policy was owned by William Skye, rather than decedent, and the cash advances or loans must be considered as being donations inter vivos made by him to plaintiff. Thus, no collation is due decedent's succession for donations inter vivos made by William Skye. We also find that defendants failed to prove that decedent was the owner of the Mutual life insurance policy. We find it immaterial and irrelevant to make any determination as to who made the payments of the premiums on these policies or who directed that their cash values be given to a certain person, in making a determination of whether the cash values or loans received by plaintiff must be collated. The important factor is who was the owner of the policies. A donation inter vivos can only be made by the present owner of the property. LSA-C.C. Article 1528.
It is our opinion that the trial court was clearly wrong in finding that plaintiff must collate the cash values or loans she received from the life insurance policies.

DEBT OF THE SUCCESSION: $526.58
Plaintiff contends that the trial court committed manifest error in finding that she had failed to introduce any evidence to show that $526.58 was improperly listed as a debt of the succession in the executor's petition for authority to pay the succession debts. The executor testified that a joint venture existed between decedent and Melvin Bauer, known as "Skye and Bauer", and that the debt of $526.58 represented the succession's prorata share of the joint venture's debts.
LSA-C.C.P. Article 3244 provides:
"Art. 3244. Effect of inclusion of claim in petition or in tableau of distribution
The inclusion of the claim of a creditor of the succession in the succession representative's petition for authority to pay debts or in his tableau of distribution creates a prima facie presumption of the validity of the claim; and the burden of proving the invalidity thereof shall be upon the person opposing it."
*1232 See also Succession of Martin, 335 So.2d 494 (La.App. 2 Cir. 1976), writ denied, 337 So.2d 516 (La.1976).
Article 3244 is directly applicable to the situation before us and the burden of proving the invalidity of the claim is on the opponent-appellant (plaintiff).
Our review of the record establishes that the trial court's finding that plaintiff failed to prove the invalidity of the $526.58 debt is not clearly wrong.

THE $7,500 PROMISSORY NOTE
Plaintiff contends that the trial court committed manifest error in finding that William Skye had committed no violation of his fiduciary duty, as executor, by failing to collect and use the proceeds from a $7,500 promissory note to pay off the debts of the succession, or to distribute the proceeds from the note among decedent's heirs. The sworn detailed descriptive list of assets lists as item XI:
"One promissory note dated October 9, 1973, payable to the order of Ethel R. Skye, the maker being Skye Realty Company, for $7,500 due on demand, bearing no interest."
Skye Realty is a partnership composed of William Skye and his wife. William Skye explained that he has been paying one Lena Williams $50 per month, in accordance with directions given by decedent in a note, and that these sums have been taken from the proceeds of the promissory note. However, he admitted that no such bequest had been made to Lena Williams in decedent's will and that the note failed to meet the requirements of form for an olographic will. LSA-C.C.P. Article 3191 provides, in pertinent part, that:
"Art. 3191. General duties; appointment of agent
A succession representative is a fiduciary with respect to the succession, and shall have the duty of collecting, preserving, and managing the property of the succession in accordance with law. He shall act at all times as a prudent administrator, and shall be personally responsible for all damages resulting from his failure so to act."
LSA-C.C.P. Article 3211 provides:
"Art. 3211. Duty to take possession; enforcement of claims and obligations
A succession representative shall be deemed to have possession of all property of the succession and shall enforce all obligations in its favor."
Official Revision Comment (d) to LSA-C. C.P. Article 3211 provides:
"(d) The above article makes no provision as to the time when the representative should take possession. This point is covered by the `prudent administrator' concept, and thus he should be required to take possession as soon as practicable."
As to the issue of duty, a succession representative, whether executor or administrator, has the duty to collect all property of the succession. He has the further duty to preserve and manage the succession property as a prudent administrator. Langendorf v. Administrators of Tulane Educational Fund, 361 So.2d 905 (La.App. 4 Cir. 1978), writ denied, 363 So.2d 1384 (La.1978), and 364 So.2d 120 (La.1978).
The evidence shows that William Skye (the executor) has refused to collect the note from the Skye Realty Company for over seven years. We find that this constitutes a breach of his fiduciary duty to collect all property of the succession and that the trial court's finding to the contrary is manifestly erroneous. William Skye must collect this note and distribute its proceeds among decedent's heirs. He has admitted that this should be done in his testimony and in certain letters written by him and introduced in evidence.

EXECUTOR'S COLLECTION OF EXECUTOR'S FEE AND ATTORNEY'S FEE
Plaintiff contends that the trial court committed manifest error in allowing William Skye to collect both an executor's fee of 2½% and an attorney's fee of 5% for his administration of the succession. A review of decedent's will shows that she *1233 named William Skye as executor of her estate, but she made no mention of naming him as attorney. However, the trial court found, "from other surrounding circumstances, it was obvious that she knew that he would also act as attorney for the estate". Thus, the trial court held that,
"It would be superfluous, therefore, to have him named both as executor and as attorney".
It has long been the settled jurisprudence of this State that an executor who is also an attorney at law will not be allowed to charge for his services as attorney. Baldwin's Executor v. Carleton, 15 La. 394 (La. 1840); Succession of Key, 5 La.Ann. 567 (La.1850)[3]. As was noted by Justice Hawthorne in Footnote 1 in his dissent in Succession of Houssiere, 247 La. 764, 174 So.2d 521 (1965), on page 527:
"It is entirely natural for a succession representative to employ himself as counsel when he is also an attorney, but that practice has been thoroughly condemned in the strongest language by this court as a conflict of interest to the extent of allowing him no remuneration for such services."
We find that it was error for the trial court to allow William Skye to collect 5% of the value of the estate as an attorney's fee.
LSA-C.C.P. Article 3351 provides:
"Art. 3351. Amount of compensation; when due
An administrator or executor shall be allowed a sum equal to two and one-half percent of the amount of the inventory as compensation for his services in administering the succession. The court may increase the compensation upon proper showing that the usual commission is inadequate."
The trial court did allow William Skye to collect 2½% of the inventory as his executor's fee for administering the estate. The trial court then went on to state that, if it felt that William Skye was unable to collect an attorney's fee, it would have increased his compensation, in the form of executor's fees, to 7½%. It noted that it had much discretion in fixing fees for the administration of successions and that this matter had involved a considerable amount of litigation. See Succession of Lasyone, 395 So.2d 413 (La.App. 3 Cir. 1981); In Re Successions of Prejean, 234 So.2d 757 (La.App. 3 Cir. 1970).
We agree that the trial court has much discretion in fixing fees for an administrator or executor who administers a succession. However, we are of the opinion that the trial court would have clearly abused its discretion had it allowed William Skye to collect an executor's fee of 7½% of the inventory. The history of the litigation involved in this matter and the evidence in the record clearly show that much of the litigation was the result of untenable and/or controversial actions undertaken by William Skye. Our decisions herein on some of the issues raised by plaintiff support this conclusion. We will award William Skye an executor's fee of 2½% of the inventory which we feel will adequately compensate him for administering this succession. As for his attorney's fees, he may collect those from the heirs (other than plaintiff) he represents as an attorney.

EXECUTOR'S SALE OF SUCCESSION PROPERTY TO HIMSELF
Plaintiff contends that the trial court committed manifest error in finding no evidence of ill practices in William Skye's private sale of decedent's home to himself. The trial court held that all provisions of law regarding such sales were strictly complied with.
LSA-C.C.P. Articles 3194 and 3195 provide:
"Art. 3194. Contracts between succession representative and succession prohibited; penalties for failure to comply
A succession representative cannot in his personal capacity or as representative of any other person make any contracts with the succession of which he is a representative. *1234 He cannot acquire any property of the succession, or interest therein, personally or by means of third persons, except as provided in Article 3195.
All contracts prohibited by this article are voidable and the succession representative shall be liable to the succession for all damages resulting therefrom."
"Art. 3195. Contracts between succession representative and succession; exceptions
The provisions of Article 3194 shall not apply when a testament provides otherwise or to a succession representative who is:
. . . . .
(4) An heir or legatee of the deceased; or"
Under the provisions of the above articles, it was permissible for William Skye, who is an heir of decedent, to purchase decedent's home. The evidence does show that all applicable provisions of law were complied with. In addition, William Skye secured three appraisals of the home before purchasing it. He paid $35,000 for the home, which was an amount in excess of that set by two of the appraisers. We find no merit in plaintiff's argument.

EXCLUSION OF THREE PIECES OF IMMOVABLE PROPERTY FROM DECEDENT'S SUCCESSION
Plaintiff contends that the trial court committed manifest error in finding that three pieces of immovable property, which allegedly belonged to decedent's mother (plaintiff's grandmother) had been properly excluded from these succession proceedings.
William Skye testified that his grandmother, Elise Schmalinski, and others, had formed a corporation known as the Schmalinski Realty Company in 1923. At that time, Mrs. Schmalinski transferred five tracts of land to the Schmalinski Realty Company. However, she apparently failed to transfer the ownership of the three disputed tracts of land to the Schmalinski Realty Company. William Skye testified that he believed that the three tracts of land were still in his grandmother's estate and that the only way to free them would be to re-open her succession. Then, someone would have to qualify as a provisional administrator and show that these tracts of land were inadvertently left out of the transfer to the Schmalinski Realty Company. The Schmalinski Realty Company was liquidated in the early 1950's, and the liquidation proceedings would have to be amended to have the three tracts of land transferred to decedent's succession. Only after all of this had been taken care of, could the judgments rendered in decedent's succession proceedings be amended so that the three tracts of land could then be transferred to decedent's heirs.
This was the only evidence introduced concerning these three tracts of land, and it appears that the trial court correctly found that it would be improper to include them in decedent's succession at this time. However, any rights which may belong to plaintiff on these tracts are reserved to her pending further proceedings, if any.

ALLEGED VERBAL PARTNERSHIP AGREEMENT BETWEEN WILLIAM SKYE AND DECEDENT
Plaintiff contends that the trial court committed manifest error in finding that there was no evidence to show that the sum of $10,575.98 was improperly listed as a debt of the succession owed to a partnership named Skyelands and, ultimately, William Skye.
The evidence does show that a verbal partnership named Skyelands existed between decedent and William Skye. Plaintiff first argues that the trial court erred in allowing William Skye to amend a judgment dated May 23, 1975, and rendered in these proceedings. There is no merit to this argument since this Court's decision in Succession of Skye, supra, vacated and set aside all final judgments previously signed in these proceedings, including the one complained of by plaintiff.
However, there are some aspects of partnership business transactions, conducted between *1235 William Skye and decedent and testified to by William Skye, which tend to case some suspicion on the debt allegedly owed Skyelands by decedent. A detailed memorandum written by William Skye concerning these transactions and the actual formation of the partnership, together with all of the records of the partnership, were introduced in evidence.
All of the above indicate that Skyelands was a partnership formed on a 50%-50% basis. The main purpose of the partnership was to develop a 320-acre tract of rural land. Prior to the formation of Skyelands, decedent and Melvin Bauer had formed a partnership concerning this tract of land and others, although the land was owned in indivision by Bauer and decedent. William Skye purchased Bauer's undivided one-half interest in the 320-acre tract of land in 1969. The property was completely undeveloped, and William Skye paid Bauer $16,000 for his one-half interest in the land, which had to be cleared and drained before any development could take place.
The evidence shows that William Skye financed his purchase of Bauer's interest and the clearing and the draining of the land in the following manner. William Skye had decedent "sell" her undivided one-half interest in the tract of land to him, and simultaneously, executed a "counter letter" stating that the sale was nothing more than a simulation. He then secured an interim loan from Rapides Bank for $45,000, using the 320-acre tract of land as security therefor. Previously, he had obtained a commitment from the Federal Land Bank of New Orleans (Federal Bank) for a loan of $37,600 to be secured by a mortgage on the land once it was cleared. However, the Federal Bank advanced him $33,500 before he had to pay for the clearing, drainage, and engineering work, and he then opened an account in Rapides Bank under the name "Skyelands" into which he deposited the $33,500. He then used this money to pay off his balance at the Rapides Bank on the interim loan which totaled some $16,338.13 (the purchase price of the land from Bauer with interest). The remainder of the money in the Skyelands account, together with another advance of $2,200 made by the Federal Bank, which was also deposited in the Skyelands account, produced a total of $19,331.87 in the account.
Between November, 1969 and October, 1970, a total of $19,623.13 was paid out of the Skyelands account for clearing, drainage, and engineering work done on the land. There is no explanation as to how the overdraft on the Skyelands account was covered or whether there was any overdraft that existed during this period of time. The first installment came due on the Federal Bank loan on January 1, 1971, and William Skye had to put up $4,000 of his own money to cover the installment, which totaled some $4,137.08, as there was less than adequate funds on hand in the Skyelands account.
William Skye had negotiated a lease with a neighboring landowner for a three-year term. There was no rent due the first year as the lessee agreed to disc the land in lieu thereof. For the years 1972 and 1973, the lessee paid rentals in the amount of $2,560 per year. The total income from various sources to Skyelands, through December, 1964, amounted to $13,109.75. William Skye used the income from Skyelands to partially pay off the loan he had received from the Federal Bank. However, we note that this loan was also used by William Skye to pay Bauer for his undivided one-half interest in the land, in addition to the expenses of clearing, draining, and the engineering work done on the land. Thus, income from the partnership, 50% of which belonged to decedent, was used to pay off a personal debt of William Skye, i.e., his purchase of Bauer's undivided one-half interest in the land. However, William Skye consistently maintained at the trial of this matter that his mother (decedent) owned no part of the undivided one-half interest he had acquired from Bauer even though she was, in effect, paying a portion of the purchase price. The trial court acknowledged that William Skye testified to this, but stated that it could do nothing simply because she had made a bad deal.
*1236 William Skye testified that he and decedent had entered into an oral contract whereby she agreed that he could use some of her income from Skyelands to pay for his undivided one-half interest in the property. He admitted that approximately 75% of the loan was used to his benefit, while the other 25% benefited decedent. But, according to his testimony only, decedent agreed that she would pay back 50% of the loan from Federal Bank. The loan at Federal Bank was paid off in April of 1974, at which time the outstanding indebtedness was $34,158.09. William Skye also claimed that the partnership owed him $4,300 that he had advanced to it, making the partnership liable to him in the amount of $38,458.09. He then multiplied this figure by 55% to come up with the sum of $21,151.95. Dividing $21,151.95 by 50%, William Skye then claimed that decedent owed this share of Skyeland's debts to him, or $10,575.98. However, William Skye fails to take into account the fact that a portion of decedent's income from Skyelands was used to pay his personal debt. The memorandum introduced by William Skye shows that the cost of clearing, draining, etc., the land was $19,623.13.
It is impossible to discern from the record the amounts of income earned by Skyelands, which were used to pay off the principal and interest on that portion of the loan from Federal Bank used by William Skye to pay his personal debts. However, unlike the trial court, we find that plaintiff has recourse against William Skye for a return of these diverted funds to the succession.
The record includes scant evidence concerning any agreement that may have existed between decedent and William Skye regarding the use of decedent's income from Skyelands by William Skye to pay off his personal debts. However, he admitted that on certain documents written by decedent, which were introduced in evidence, decedent denied having entered into any such agreement with him. We find that no such agreement existed and that decedent expected to receive 50% of the income from Skyelands less the amount necessary to pay that portion of the loan from Federal Bank used to clear and drain her share of the 320-acre tract of land.
Plaintiff's remedy for the recovery of decedent's income, used by William Skye to pay off his personal debts, is found in the civil law action de in rem verso or unjust enrichment. Minyard v. Curtis Products, Inc., 251 La. 624, 205 So.2d 422 (1967), stated that:
"There are now five prerequisites to the successful suit by actio de in rem verso: (1) there must be an enrichment, (2) there must be an impoverishment, (3) there must be a connection between the enrichment and resulting impoverishment, (4) there must be an absence of `justification' or `cause' for the enrichment and impoverishment, and finally (5) the action will only be allowed when there is no other remedy at law, i.e., the action is subsidiary or corrective in nature."
See also Vizinat v. Reed, 406 So.2d 263 (La.App. 3 Cir. 1981).
There can be no doubt that William Skye was enriched by using decedent's share of the income from Skyelands to pay off his personal debt, and that decedent was impoverished by the loss of that income. The connection between the enrichment and impoverishment is obvious. We have found that there was no "justification" or "cause" for the enrichment and impoverishment. Finally, we know of no other remedy at law, available to plaintiff, to correct this unjust situation.
We have already noted that it is impossible to discern from the record the amount of decedent's income from Skyelands that was diverted illegally by William Skye. Thus, we have no choice but to remand this case to the trial court for a determination of how much of decedent's income was illegally diverted based on the evidence presently in the record and any additional evidence, which the trial court shall allow the parties to adduce. Once this amount is determined, it is to be offset against any debt which decedent's succession, through Skyelands, may owe to William Skye.

*1237 EXECUTOR'S BOUNDARY AGREEMENT
Plaintiff contends that the trial court erroneously approved a boundary agreement executed by the executor and an adjoining landowner since there was no evidence of a boundary dispute presented to the court. We find no merit to this argument. The evidence clearly shows that a boundary dispute did exist and that this fact was made known to the court. All provisions of law allowing a succession representative to enter into such agreements with court approval were followed. The 320-acre tract of land lost 17.3 acres in the boundary agreement and now contains only 306.3 acres of land.[4]
EXECUTOR'S PARTITION OF THE 306.3-ACRE TRACT OF LAND BETWEEN HIMSELF AND DECEDENT, AND BETWEEN HIMSELF AND THE OTHER HEIRS.
Plaintiff contends that the trial court erred in finding that the partition of the 306.3-acre tract of land by the executor had been carried out in accordance with the applicable law. William Skye filed a petition for a verbal partition of immovable property in which he alleged in paragraph 3 thereof that:
"Petitioner shows that prior to decedent's death, she and appearer had verbally agreed to partition said property so that Petitioner received the Northern Half of the tract and the decedent received the Southern Half of the tract." (Emphasis ours.)
Paragraph 8 of that same petition reads:
"Petitioner further shows that he, as a legatee under the Last Will and Testament of the decedent, will receive one-third of the decedent's 153.15 acres, or 51.05 acres, and Petitioner proposes to be recognized as the owner of the Northern 204.20 acres of said tract, with the other legatees being recognized as the owner of the Southern 102.10 acres in proportions of an undivided one-half interest therein in each."
We find that the trial court committed manifest error in ordering a partition of the 306.3-acre tract of land pursuant to the request contained in the petition, and allegedly based on a verbal contract to partition the land entered into between William Skye and decedent.
LSA-C.C. Article 2275 provides:
"Art. 2275. Verbal sale of immovables
Art. 2275. Every transfer of immovable property must be in writing; but if a verbal sale, or other disposition of such property, be made, it shall be good against the vendor, as well as against the vendee, who confesses it when interrogated on oath, provided actual delivery has been made of the immovable property thus sold." (Emphasis ours).
It is well settled that an extrajudicial partition of immovable property cannot be established by parol evidence. Fox v. Succession of Broussard, 161 La. 949, 109 So. 773 (1926). Partition is a form of exchange and an exchange of rights to immovables must be in writing the same as sales and transfers of immovables. Therefore, a partition of an immovable between co-owners must be in writing. Faulk v. Faulk, 180 So. 887 (La.App. 1 Cir. 1938); Fox v. Succession of Broussard, supra; Milburn v. Wemple, 156 La. 759, 101 So. 132 (La.1924).
Attached to the petition filed by William Skye were affidavits attesting to the fact *1238 that notice of William Skye's proposed action had been published. However, these notices failed to even mention the fact that William Skye was seeking a partition between himself and decedent of certain immovable property. Also attached to the petition was a notice of no opposition to the executor's proposed action. This was all the trial court had before it when it approved the verbal partition as requested by William Skye.
As can be seen from paragraph 8 of William Skye's petition, reproduced above, he also sought to effect a partition of succession property among the heirs.
LSA-C.C.P. Article 3462 provides:
"Art. 3462. Partition of succession property
When a succession has been opened judicially, the coheirs and legatees of the deceased cannot petition for a partition of the succession property unless they could at that time be sent into possession of the succession under Articles 3001, 3004, 3006, 3061, 3362, 3371, 3372, or 3381."
Succession of Fontenot v. Demaret, 185 So.2d 861 (La.App. 3 Cir. 1966), had occasion to interpret LSA-C.C.P. Article 3462 and, citing that article, stated, on page 865, that:
"a partition among the heirs of a succession cannot be provoked until the succession has been settled by the administration or until the heirs desire to accept the succession unconditionally and can be sent into possession without an administration."
It does appear that the heirs of decedent could have been sent into possession of the succession property at the time that William Skye filed his petition to partition that property. However, LSA-C.C.P. Article 3461 provides:
"Art. 3461. Venue; procedure
The petition for the partition of a succession shall be filed in the succession proceeding, as provided in Article 81(2).

In all other respects and except when manifestly inapplicable, the procedure for partitioning a succession is governed by the provisions of Articles 4601 through 4614." (Emphasis ours.)
LSA-C.C.P. Article 4601 provides that partitions of property may be made either non-judicially or judicially. LSA-C.C.P. Article 4602(1) provides that a partition must be judicial when a party is an unrepresented absentee, minor, or mental incompetent. The evidence shows that plaintiff was an unrepresented absentee when William Skye sought to partition the succession property, and thus, a judicial partition was required.
LSA-C.C.P. Article 4603 provides, in pertinent part:
"Art. 4603. Same; procedure; venue
. . . . .

Except as otherwise provided by law, a partition proceeding is subject to the rules regulating ordinary proceedings." (Emphasis ours.)
Section (b) of the Official Revision Comments to this article explains the exception contained therein in the paragraph reproduced above.
"(b) The exception at the beginning of the second paragraph refers to: (1) the use of summary proceedings in the homologation of a judicial partition or in the trial of an opposition thereto, under Arts. 4609 and 4610, infra; and (2) the trial of partition proceedings in vacation, under Art. 196(4), supra."

LSA-C.C.P. Article 4622 provides:
"Art. 4622. Petition
The petition for the partition of property in which an absentee owns an interest, under the articles of this Chapter, shall allege the facts showing that the absent and unrepresented defendant is an absentee, as defined in Article 5251, shall describe the property sought to be partitioned and allege the ownership interests thereof, and shall be supported by an affidavit of the petitioner or of his counsel that the facts alleged in the petition are true." (Emphasis ours.)
LSA-C.C.P. Article 4623 provides:
"Art. 4623. Order; service of citation; contradictory proceedings

*1239 When the petition for a partition discloses that the plaintiff is entitled thereto, and that the absent and unrepresented defendant is an absentee who owns an interest in the property, the court shall appoint an attorney at law to represent the absent defendant, and shall order the publication of notice of the institution of the proceeding.

The citation to the absent defendant and all other process shall be served on or service thereof accepted by the attorney at law appointed to represent him, and all proceedings shall be conducted contradictorily against this attorney." (Emphasis ours.)
It can be seen from the above articles that a judicial partition is required when one of the parties to the proceedings is an unrepresented absentee as was plaintiff. Further, when an unrepresented absentee is a party to a judicial partition, it is required that the petitioner instituting the partition proceeding make that fact known to the court and the allegations contained in the petition must be supported by an affidavit of the petitioner or his counsel attesting to their verity. The court is then required to appoint an attorney to represent the absent defendant.
A review of the record shows that William Skye failed to allege that an unrepresented absentee was a party to the partition proceeding, nor is his petition verified in any manner. Further, the record shows that no attorney was appointed to represent the plaintiff (absentee) and no proceeding was conducted contradictorily with any attorney representing plaintiff. In essence, what the record reveals is that this partition of succession property was carried out ex parte, in clear violation of the applicable provision of law, and cannot be given any effect.
We find that, under the provisions of LSA-C.C.P. Articles 2002(1) and (2)[5], the judgment rendered by the trial court homologating the partition of the succession property between decedent's heirs must be annulled, vacated, and set aside.
The evidence indicates that after litigation began over these matters, William Skye and Jack Skye sold their interest in the succession property sought to be partitioned to a third party named Bollich. The issue of the validity vel non of the sale to Mr. Bollich, of course, is not before us at this time, nor is Bollich a party to this litigation. Hence, determination of that issue must await other disposition or litigation[*].
ALLEGED INCLUSION OF PROPERTY BELONGING TO PLAINTIFF IN THE DETAILED DESCRIPTIVE LIST FILED BY THE EXECUTOR.
Plaintiff contends that the executor included in his sworn detailed descriptive list of property belonging to decedent, certain property actually owned by plaintiff. It appears that on June 28, 1944, plaintiff donated a usufruct over certain stock in the Schmalinski Realty Company to decedent. Plaintiff had inherited the stock from her father. The Schmalinski Realty Company was liquidated in 1953, and the liquidator (who is also the executor in the action before us) transferred all of the immovable property owned by the corporation to decedent and Melvin Bauer, in the proportions of an undivided one-half interest *1240 each. Plaintiff argues that the usufruct she donated to decedent terminated upon decedent's death. Thus, the property which decedent had acquired from the Schmalinski Realty Company because of the stock held by her, but over which she had only a usufruct, now belongs to plaintiff in full ownership and should have been excluded by the executor from the sworn detailed descriptive list.
The act of donation by which plaintiff granted to decedent a usufruct over her shares of stock in the Schmalinski Realty Company provided that, in the event of liquidation of the corporation, the usufruct would extend to any property received by decedent upon surrender of the shares of stock. However, plaintiff failed to introduce any evidence whatsoever to show exactly which property she acquired the full ownership of, upon decedent's death and the termination of the usufruct, and which she alleges was improperly included in the sworn detailed descriptive list. For this reason, we find that plaintiff has failed to prove that she has the full ownership of any property included in said list.

OPTION OF FANNIE MARKS AND SADIE MASTERSON
Plaintiff contends that the rights of Sadie Masterson and Fannie Marks, as granted to them by Melvin Bauer and decedent in an option agreement, should be taken into account by the executor in his preparation of the final account and judgment of possession. William Skye filed a peremptory exception of no right of action of plaintiff to assert these rights on behalf of Fannie Marks and Sadie Masterson. The record fails to reveal whether the trial court rendered any judgment on this exception. But, its written reasons for judgment make no mention of the option agreement or any rights anyone may have under such an agreement.
Lambert v. Donald G. Lambert Construction Company, 370 So.2d 1254 (La.1979), had occasion to discuss the peremptory exception of no right of action and its uses. Lambert stated, on page 1255, that:
"Except as otherwise provided by law, an action can be brought only by a person having a real and actual interest which he asserts. La.Code Civ.P. art. 681. The exception of no right of action raises the question of whether the plaintiff has any interest in enforcing judicially the right asserted. Stevens v. Johnson, 230 La. 101, 87 So.2d 743 (1956) (per curiam on application for rehearing); Ritsch Alluvial Land Co. v. Adema, 211 La. 675, 30 So.2d 753 (1947); Outdoor Electric Advertising v. Saurage, 207 La. 344, 21 So.2d 375 (1945). Moreover, the exception of no right of action, or no interest in the plaintiff to institute the suit, is a peremptory exception which may be pleaded at any state of the proceeding in the trial court prior to a submission of the case for a decision or for the first time in the appellate court if pleaded prior to a submission of the case for a decision if proof of the ground of the exception appears of record and even may be noticed by either the trial or appellate court of its own motion. La.Code Civ.P. arts. 927, 928 and 2163; Stevens v. Johnson, supra; see also McMahon, The Exception of Want of Interest, 11 Tul.L.Rev. 527 (1937). In considering this issue, we are mindful that the articles of our code of civil procedure are to be construed liberally and with due regard for the fact that forms of procedure implement the substantive law and are not an end in themselves. La.Code Civ.P. art. 5051."
The option agreement is dated December 7, 1953. It provides that decedent and Melvin Bauer agree to transfer to Fannie Marks and Sadie Masterson an undivided 22.5% interest in and to certain rural property owned by the Schmalinski Realty Company located in the vicinity of Echo, Louisiana, in the event that Melvin Bauer and decedent decide to exercise the option granted them by Fannie Marks and Sadie Masterson to purchase all of the stock owned by them in the Schmalinski Realty Company. Apparently, the option was exercised, but the rights of Fannie Marks and Sadie Masterson to an undivided 22.5% interest *1241 in the rural property once owned by the Schmalinski Realty Company have never been recognized. A review of the sworn detailed descriptive list submitted by the executor shows that the rights are nowhere recognized therein. However, there was some testimony to the effect that these two persons may have verbally relinquished their rights under the option agreement.
We find that plaintiff has no right of action to enforce judicially any rights that Fannie Marks or Sadie Masterson may have in or to any succession property with which we are concerned. Plaintiff has no real and actual interest in these rights, which she is attempting to assert.

EXISTENCE OF PARTICULAR LEGACIES IN DECEDENT'S WILL
Plaintiff contends that the executor improperly disbursed $8,750 to Robert E. Skye and Julie R. Skye as particular legacies when the decedent's will contains no particular legacies. Decedent's will does contain the following provision:
"`I will and bequeath to each of my children, Mary S. Maycock, William E. Skye and Jack B. Skye a ¼ interest in my home, when sold. The other ¼ I will and bequeath to be equally divided between Robert A. Skye and Julie R. Skye.'"
Decedent's house was sold for $35,000 and the executor's final account shows that what was termed "special legacies" under the last will and testament of decedent were paid to Robert and Julie Skye in the amount of $4,375, for a total of $8,750 in particular legacies. William Skye contends that decedent's wishes were carried out and that each of her children received $8,750 as their share of the proceeds from the sale of the home, all as shown on his final account. A review of his final account fails to reveal that $8,750 in cash was paid to each of decedent's three children.
William Skye admitted that none of the money received from the sale of the house went to him, his brother, or plaintiff. Instead, he utilized the money to pay off debts of the succession. The majority of these debts consisted of William Skye's executor's and attorney's fees, together with the debt allegedly owed him by decedent in connection with the Skyelands partnership.
LSA-C.C. Article 1625 provides:[6]
"Art. 1625. Particular legacy, definition
Art. 1625. Every legacy, not included in the definition before given of universal legacies and legacies under a universal title, is a legacy under a particular title."
The gift of a one-quarter interest in her home made by decedent in her testament to her grandchildren is undoubtedly a particular legacy as it is neither a universal legacy as defined by LSA-C.C. Article 1606, nor is it a legacy under a universal title as defined by LSA-C.C. Article 1612.
William Skye explained that, if he had given his brother and sister $8,750 in cash from the proceeds of the sale of decedent's home, there would have been an inadequate amount of funds left in the succession from which to pay the succession debts. This would have necessitated the further sale of succession property and, rather than do this, he decided to use the proceeds from the sale of the home to pay the debts. Plaintiff and her brother received their share of the proceeds from the sale of the home in succession property, which would have otherwise been sold to pay succession debts. Plaintiff received property in lieu of cash for her share of the proceeds and has no cause to complain.
*1242 We find no merit in plaintiff's argument that the executor should be forced to account for his disposition of the proceeds of the sale of decedent's home.
ALLEGED FAILURE OF THE EXECUTOR TO INCLUDE CERTAIN PROPERTY BELONGING TO DECEDENT IN THE SWORN DETAILED DESCRIPTIVE LIST.
Plaintiff contends that the executor should have included six cemetery plots in his sworn detailed descriptive list. William Skye admitted that, if it was his mother who bought the plots, then they should have been included in the sworn detailed descriptive list of succession property. However, he testified that he had never even attempted to ascertain whether his mother was the owner of these six cemetery plots.
It is the duty of the succession representative to collect, preserve, and manage property of the succession in accordance with law. He is a fiduciary with respect to the succession. See LSA-C.C.P. Article 3191. William Skye breached his duty when he failed to ascertain whether the six cemetery plots belonged to decedent. This Court is going to remand this case for various purposes, one of which is that William Skye will be ordered to perform his duty and determine whether the six cemetery plots belong to decedent's succession.
Plaintiff also contends that the executor failed to include a certain washeteria in the sworn detailed descriptive list of decedent's succession property. However, the evidence shows that decedent had no ownership interest (or any other interest) in the washeteria when she died. Thus, that property was properly excluded from her succession.

JUDGMENT FOR COLLATION
Both parties raised the issue of whether a judgment for collation of money, or by taking less of the succession property, becomes a personal money judgment against the party cast, if within three days from the date her attorney is served with notice of judgment, the party cast does not notify the court of her intention to collate by taking less. Because of our decision herein, finding that plaintiff has no obligation to collate any of the items alleged by defendants to be subject to collation, this issue is moot.

DECREE
For the above and foregoing reasons, the following portion of the trial court's judgment is reversed:
That ordering plaintiff to collate the $10,000 given her by decedent, together with the cash value or loans received by plaintiff from certain life insurance policies on decedent's life;
That upholding the practice of the executor in sending Lena Williams $50 per month, rather than placing the $7,500 promissory note made out to decedent by Skye Realty among the succession assets;
That awarding William Skye an attorney's fee from succession assets;
That allowing the listing of a debt of $10,575.98 of the succession owed to William Skye in connection with the Skyelands partnership, without providing for any offset for partnership income used by William Skye to pay off his personal debt; and,
That approving the verbal partition agreement pertaining to the below described 306.3-acre tract of land between decedent and William Skye as co-owners and the partition of that same tract of land among the heirs.
"A certain piece, parcel or tract of land, together with all buildings and improvements thereon, all rights, ways and privileges thereunto appertaining, being, lying and situated in Section One, Township 1 North, Range 1 East, Rapides Parish, Louisiana, more particularly described as follows:
The North Half of Section 1, Township 1 North, Range 1 East, said property being subject to that certain Boundary Agreement dated October 16, 1975, filed and recorded in Conveyance Book 863, page *1243 862, records of Rapides Parish Louisiana, by and between William E. Skye, The Estate of Ethel R. Skye and H. Phillip Wemple, ....."
The judgment of the trial court is affirmed in all other respects.
We remand the case to the trial court with the following instructions:
a. To order William Skye to list the $7,500 promissory note made out to decedent by Skye Realty as a succession asset to be disposed of accordingly;
b. To award William Skye an executor's fee of 2½% of the inventory as compensation for his services in administering the succession;
c. To make a determination of the offset owed by William Skye against the debt of the succession owed him in connection with the Skyelands partnership based on the evidence in the record, and any additional evidence adduced by the parties on this issue and admissible in an action such as this;
d. To order William Skye to make a determination as to whether the six cemetery plots, mentioned above, belong to decedent, and should be included in her succession;
e. Finally, to render and sign all judgments necessary to terminate this succession proceeding in accordance with law.
All costs of this appeal are assessed against defendants-appellees. The assessment of costs in the trial court shall await a final disposition of this matter.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.
NOTES
[1] See Succession of Skye, infra.
[2] Sciortino v. Sciortino, supra, was overruled on other grounds. See State v. Augillard, 371 LSA-C.C.P. Article 862 provides: So.2d 798 (La.1979).
[3] There is an exception made to this rule when the will names a certain person as both the executor and the attorney to administer the estate.
[4] The tract of land is described in an act of cash sale, executed by William Skye on January 26, 1977, as follows:

"A certain piece, parcel or tract of land, together with all buildings and improvements thereon, all rights, ways and privileges thereunto appertaining, being, lying and situated in Section One, Township 1 North, Range 1 East, Rapides Parish, Louisiana, more particularly described as follows:
The North Half of Section 1, Township 1 North, Range 1 East, said property being subject to that certain Boundary Agreement dated October 16, 1975, filed and recorded in Conveyance Book 863, page 862, records of Rapides Parish Louisiana, by and between William E. Skye, The Estate of Ethel R. Skye and H. Phillip Wemple, ..."
[5] LSA-C.C.P. Article 2002 provides:

"Art. 2002. Annulment for vices of form; time for action
A final judgment shall be annulled if it is rendered:
(1) Against an incompetent person not represented as required by law;
(2) Against a defendant who has not been served with process as required by law and who has not entered a general appearance, or against whom a valid judgment by default has not been taken; or
(3) By a court which does not have jurisdiction over the subject matter of the suit.
Except as otherwise provided in Article 2003, an action to annul a judgment on these grounds may be brought at any time."
[*] We are informed by William Skye's brief on appeal that there is presently pending litigation between Mrs. Maycock and Bollich concerning the 206.3 acres.
[6] LSA-C.C. Article 1606 provides:

"Art. 1606. Universal legacy, definition
Art. 1606. A universal legacy is a testamentary disposition, by which the testator gives to one or several persons the whole of the property which he leaves at his decease."
LSA-C.C. Article 1612 provides:
"Art. 1612. Legacy under universal title, definition
Art. 1612. The legacy, under a universal title, is that by which a testator bequeaths a certain proportion of the effects of which the law permits him to dispose, as a half, a third, or all his immovables, or all his movables, or a fixed proportion of all his immovables or of all his movables."