|2REMY CHIASSON, Judge Pro Tem.
Appellant, Patricia Ann Lewis Williams, appeals a trial court order authorizing the private sale of succession property to South-downs Village Homes, L.L.C., a corporation wholly owned by the co-executors of the estates, Arthur Cullen Lewis, III, and Alexis V. Lewis.
FACTS
On April 10, 1995, the co-executors of the Succession of Arthur Cullen Lewis, Jr. and the Succession of Patricia Ann Voorhies Lewis filed a petition for authority to sell immovable property at private sale to a related party, seeking authority to sell fifty-four rent houses, (the property) to Southdowns Village Homes for the proposed amount of $75,000.00. Notice of this petition and hearing date was published twice in accordance with LSA-C.C.P. article 3282 and all creditors and interested parties were notified by 'certified mail. On May 15, 1995, a hearing was held and Mrs. Williams, sister of the co-executors, opposed the petition and sought to purchase the property herself for the amount of $76,000.00. In an effort to foster an amicable agreement between the parties, the court delayed the hearing of the evidence until May 22,1995. The parties were unable to reach an agreement and the hearing proceeded as scheduled: After hearing the evidence the trial court conducted a private auction between the Southdowns Village Homes and Mrs. Williams. During the hearing Mrs. Williams increased her offer to $85,-000.00; however, she refused to participate in the auction arguing that the co-executors should not be allowed to bid against her. Southdown Village Homes increased its offer to $90,000.00, and the court authorized the sale for that amount together with the assumption of a mortgage on the property held by the Federal National Mortgage Association in the amount of $574,144.00.
Mrs. Williams appeals the trial court order and assigned the following specifications of error:
(1) The 'trial court committed error when it allowed the Lewis Brothers to make a second, substantially greater offer for the property.
(2) The trial court committed error when it failed to find that the Lewis Brothers breached their fiduciary duties to the estate.
Prior to seeking court authority for the sale of the property, the co-executors had the property appraised by Ms. Ann Russell. Ms. Russell completed her appraisal on February 23, 1995, and later testified at the hearing in this matter. According to Ms. Russell the property was ^purchased in 1971, by Mr. A.C. Lewis, Jr., under a special federal housing program, wherein the federal govem *1004 ment insured the mortgage for 40 years at a 7 percent interest rate. In exchange Mr. Lewis was required to maintain the property as low-income housing during this time. The rental rates for the property were set by the United States Department of Housing and Urban Development (HUD). Under the original agreement Mr. Lewis had the option of prepaying the loan after 20 years and opting out of the program. However, this option was legislatively revoked in 1987 due to the devastating effect it would have to low-income housing. Ms. Williams further explained that in an attempt to counteract this change the legislature enacted the Low Income Housing Preservation and Home Ownership Act (LIHPRHA) in 1990. According to Ms. Russell, LIHPRHA became effective in 1992 and allowed homeowners under the act to apply for rent subsidies which, together with existing rent would provide an eight percent return on equity. However, Ms. Russell testified that in March of 1995, funding for LIHPRHA ceased and in her opinion LIHPRHA was “essentially dead.” She concluded that it would probably be another 5 years before another program would be in place. Because of the uncertainty with regard to the HUD program, Ms. Russell appraised the property under two different methods. She explained her appraisal as follows:
I first appraised it as is, using actual income and the actual expenses of this property. The value that I came up with was two hundred and forty thousand dollars. Well, the balance on the loan is $574,-000.00. As you can see, you have a negative value. So as it sits, as long as it’s under this program, it can’t produce enough incomé to even pay the mortgage. In fact, the income and expense statement indicates for the last two years there has not been enough income generated to pay anything but some of the interest on the mortgage •... as the property gets older the expenses are greater because of the— and they are very old. They are 40 something years old, almost 50 years old right now, these houses are.... If by some miracle HUD allowed the owners to prepay the mortgage and they could do what they wanted to with the houses, the highest and best use of them would be to sell them to individuals, if they were free to do that. So I have appraised the property ... in what I would call the best case scenario, and that is if they were free to do whatever they wanted to with them.... I have come up with an absorption rate of ■ value of the houses if they were sold and come up with a value of 1.483 million dollars. And if you subtracted from that the balance on the mortgage then the equity value under that scenario would be $908,-000.00. However, the odds are so much against that that I would give that, based on what I have learned about this HUD program, that I would give that value a 5 percent probability of occurring.
Based on the five percent probability of the property being valued at $908,000.00, she estimated the equity value of the property to be between $40,000.00 and $50,000.00. Perhaps the most telling statement made by Ms. Russell was that she would not take the property, subject Uto the mortgage, if they gave it her. Ms. Russell also pointed out that any buyer of the property would have to be approved by HUD and that this is a long process often taking 2 to 4 years.
Mr. Alexis Lewis testified that he had not yet sought HUD approval to purchase the property however, he felt very confident that he would be approved because he has managed the property for 25 years.
In this appeal Mrs. Williams does not question the appraisal but instead focuses on the fiduciary duties of the co-executors with regard to their purchase of the property. Essentially, Mrs. Williams argues that the second offer by the co-executors for $90,-000.00 constituted a breach of their fiduciary duties. She contends that “[w]hen the [co-executors] requested authority to privately sell the Property to themselves in their individual capacities, they were mandated by law to put forward their best offer.” Mrs. Williams has not cited any authority for this specific legal argument nor have we been able to find any. Accordingly we will scrutinize the actions of the co-executors in accordance with general legal principles regarding the fiduciary duties of succession representatives.
*1005 LSA-C.C.P. article 3191 provides that “[a] succession representative is a fiduciary with respect to the succession, and shall have the duty of collecting, preserving, and managing the property of the succession in accordance with law. He shall act at all times as a prudent administrator, and shall be personally responsible for all damages resulting from his failure so to act.” Although LSA-C.C.P. article 3194 prohibits a succession representative from contracting with the succession of which he is a representative or acquiring property of the succession, article 3195 excepts from this rule those succession representatives that are also “[a]n heir or legatee of the deceased.” See, Succession of Skye, 417 So.2d 1221, 1234-35 (La.App. 3d Cir.), writ denied, 422 So.2d 165 (La.1982).
A succession representative may sell succession property in order to pay debts and legacies, or for any other purpose, when authorized by the court. (Emphasis ours) LSA-C.C.P. article 3261. When considering an executor’s application for authority to sell succession property, the trial judge must give due consideration to any oppositions and the reasons for such. LSA-C.C.P. arts. 3283 and 3284. Succession of Taglialavore, 500 So.2d 393, 396 (La.1987). If the court determines that the sale is in the best interest of the succession, it may authorize either |sthe public or private sale of the succession property with neither having priority over the other. Id. “Of course the property should be sold for the best price reasonably obtainable.” Id.
In the instant case the co-executors, who are also heirs of the deceased, are permitted by law to purchase succession property. The record reveals that the co-executors had the property professionally appraised, petitioned the court for authority to sell, published notice for authority to sell the property and provided notice to all creditors and interested parties by certified mail. Having complied with all the applicable provisions of law we can only conclude that the co-executors acted as prudent administrators in the sale of this property, Furthermore, contrary to Mrs. Williams’ argument, it is our belief that the co-executors’ duty to preserve the succession property required them to accept the' highest offer for the property, notwithstanding the fact that the offer came from a corporation wholly owned by the co-executors. See Succession of Dunham, 393 So.2d 438 (La.App. 1st. Cir.1980), modified 408 So.2d 888 (La.1981) and Succession of Voland, 296 So.2d 406, 410 (La.App. 4th Cir.), writ denied, 300 So.2d 184 (La.1974).
For the reasons set forth above, the judgment of the trial court is affirmed in all respects. All costs of this appeal are to be paid by the appellant, Mrs. Williams.
AFFIRMED.